MERCHANTS CORPORATION OF AMERICA, Libelant,

v.

NINE THOUSAND SIX HUNDRED FIFTY-FIVE LONG TONS, MORE OR LESS, OF NO. 2 YELLOW MILO and Minister of Finance (Supply Mission) of the Government of Israel, Respondents.

No. 1829.

United States District Court
S. D. Texas,
Houston Division.

Feb. 26, 1965.

Royston, Rayzor & Cook, Galveston, Tex. (Bryan F. Williams, Jr., of Galveston, Tex.), for libelant.

Baker, Botts, Shepherd & Coates, Houston, Tex. (Frank G. Harmon, Houston, Tex.), for respondents.

NOEL, District Judge.

This case, having been tried before the Court without a jury, is now ripe for the resolution of certain legal questions.

It is an action commenced by libelant as mesne assignee of the owners of the S. S. JACKIE HAUSE to recover the freight charge of a cargo of grain from the Port of Corpus Christi, Texas, to an Israeli port, allegedly earned under the charter although the vessel never left the Port of Corpus Christi.

On April 11, 1960, the vessel had arrived at Corpus Christi, Texas, and was ready for loading cargo. Before the loading was completed, and at 5:40 p. m. on April 12, 1960, a United States Marshal, acting under proceedings commenced by Stratford Factors, seized the vessel. Following the initial libel and seizure, many other vessel claimants similarly placed liens upon the vessel. The loading of the cargo was completed at 9:00 p. m. on April 12, 1960, and the master issued on board bills of lading.

On April 15, 1960, the bills of lading, along with other documents required by the charter party, were presented to the office of the Government of Israel Supply Mission, which together with its cargo are the respondents herein, for payment even though the vessel was still under seizure.

On the morning of April 18, 1960, the next business day following April 15, 1960, the Chief of the Ocean Transportation Branch in the Commodity Stabilization Service of the Department of Agriculture, the agency in charge of the pertinent portion of the program under which the respondent Mission was shipping its cargo,[1] telephoned the Mission and formally advised that he had learned of the vessel's seizure and ordered the Mission not to pay any freight under the charter party until further notified. This order was subsequently confirmed by a telegram dated the same day.

Upon becoming aware of the vessel's inability to transport the cargo as it had contracted to do, the respondent Mission in meetings with creditors and other interested parties attempted to work out a program by which the libels could be lifted and the vessel permitted to sail. All such efforts having failed and the vessel owner having acknowledged by letter dated April 29, 1960, its inability to fulfill its charter obligations, the Mission sought and obtained from the United States District Court for the Southern District of Texas, Judge Allen B. Hannay presiding, an order dated May 6, 1960 permitting the discharge of the cargo for trans-shipment aboard another vessel. The basis for Judge Hannay's order was that the vessel had breached its charter party.[2]

The charter party between the vessel owner and the respondent Mission provides in part in paragraph 8 as follows:

> "*Freight Payment* cont'd.:
>
> Freight is deemed earned on cargo as taken on board and is discountless and non-returnable, vessel and/or cargo lost or not lost."

The libelant relies upon this provision of the charter for its claim to the freight. Respondent Mission asserts, among other defenses, that the ship owner having breached the charter, as was found by Judge Hannay, the Mission was

---

1. Respondent was shipping its cargo under a program established by Congress whereby friendly foreign governments may enter into agreements with the United States to purchase surplus grain in their respective foreign currency instead of United States dollars. 7 U.S. C.A. Chapter 41. Foreign governments operating under this program are required to utilize American flag vessels for transporting at least 50% of the purchased surplus grains. 46 U.S.C.A. § 1241(b). When an American flag vessel is used, the foreign government is not obligated to pay the difference between the American flag rate and the foreign flag rate, which approximates 50%, although the United States pays the entire freight in United States dollars. See 7 C.F.R. § 11.12.

2. See Order for the Unlivery of Cargo, filed in Stratford Factors v. S. S. JACKIE HAUSE, AD. 269 (S.D.Tex., Corpus Christi Div.).

therefore released from its obligations to pay freight required under the charter. Libelant as assignee of the ship owner in regard to the freight stands in no better shoes than his assignor. As a matter of substantive law of assignments, if payments under an executory contract are assigned, the debtor may set up the failure of the assignor to fulfill his part of the contract, even though the failure occurred after notice of assignment, for the assignor cannot give another a larger right than he has himself.[3] Furthermore, the doctrine of *res judicata* is applicable to assignees of parties as well as to parties themselves; therefore, the libelant is equally bound with the ship owner by the determination of Judge Hannay that the vessel had breached its charter.[4]

The libelant, however, contends that by April 12, 1960 when the cargo was loaded, or at least by April 15, 1960 when the necessary documents were presented to the respondent Mission, the vessel had fully performed those obligations required of it to earn the freight, and any breach on its part occurring several weeks after it became entitled to the freight would be no defense to its right to the freight.

■ It is unnecessary to decide the correctness of this contention, for the Court, after reconsideration of the legal authorities submitted, concludes that under the circumstances of this case the vessel did not earn the freight.

The cases of The Malcolm Baxter, Jr., 277 U.S. 323, 48 S.Ct. 516, 72 L.Ed. 901 (1928); Allanwilde Transp. Corp. v. Vacuum Oil Co., 248 U.S. 377, 39 S.Ct. 147, 63 L.Ed. 312 (1919); International Paper Co. v. The Gracie D. Chambers, 248 U.S. 387, 39 S.Ct. 149, 63 L.Ed. 318 (1919) and Standard Varnish Works v.

The Bris, 248 U.S. 392, 39 S.Ct. 150, 63 L.Ed. 321 (1919) are not controlling. In each of those cases the freight was deemed earned under a prepaid freight clause similar to the one here, although the voyage was not performed, since the failure of the voyage was not the result of fault on the part of the ship owner.

The prepaid freight clause involved here was developed to require the cargo owner to share with the vessel owner to some extent the inherent risks of ocean transportation attributable to uncontrollable events such as perils of sea, acts of God, and restraint of princes. However, no case has been found which imposed upon a charterer the obligation to pay freight under such a clause where the failure of the voyage was attributable to the fault of the vessel owner. To the contrary, the converse is the rule. See Schirmer Stevedoring Co. v. Seaboard Stevedoring Corp., 306 F.2d 188, 191 (9th Cir. 1962); Silva v. Bankers Commercial Corp., 163 F.2d 602, 606 (2d Cir. 1947); Mitsubishi Shoji Kaisha, Limited v. Societe Purfina Maritime, 133 F.2d 552, 558 (9th Cir. 1943); Mediterranean Agencies, Inc. v. Rethymnis & Kulukudis Ltd., 185 F.Supp. 34 (S.D.N.Y.1960); The Louise, 58 F.Supp. 445 (D.Md.1945); and The Laurent Meeus, 43 F.Supp. 807 (S.D.Calif.1942).

The voyage in the instant case was frustrated due to the fault of the ship owner in permitting the occurrence of conditions giving rise to a libel and then in failing to preserve the financial integrity of the vessel to such an extent as to enable it to remove the libel by bond or otherwise.

Therefore, freight was not earned under the prepaid freight clause in question.

3. St. Mary's Bank v. Cianchette, 99 F. Supp. 994 (D.Me.1951); American Bridge Co. of New York v. Boston, 202 Mass. 374, 88 N.E. 1089; Williston on Contracts § 433 (3d ed.).

4. See United States v. New York Term. Whse. Co., 233 F.2d 238 (5th Cir. 1956); Westgate v. Maryland Cas. Co., 147 F. 2d 177 (6th Cir. 1945); Le Duc v. Normal Park Presbyterian Church, 142 F.2d 105 (7th Cir. 1944); Tillman v. National City Bank, 118 F.2d 631 (2d Cir. 1941)

575

Proctor for respondents shall submit findings of fact and conclusions of law consistent with this Memorandum.

Clerk will file this Memorandum and send a copy to respective proctors.