830 F.2d 1321
 1988 A.M.C. 1053, 9 Fed.R.Serv.3d 640
 LOUIS DREYFUS CORPORATION, Plaintiff-Appellee,
v.
27,946 LONG TONS OF CORN, etc., et al., Defendants.
Korea Maritime Transport Co., Defendant-Appellant.
ADNAC, INC., and the St. Charles Grain Elevator Company,
Plaintiffs-Appellees Cross-Appellants,
v.
M/V ORIENT TRADER, etc., and Korea Maritime Transport
Company, Defendants- Appellants Cross-Appellees.
 No. 86-3569.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 29, 1987.
 
 M.D. Yager, New Orleans, La., for defendants-appellants.
 Earl S. Eichin, New Orleans, La., for Dreyfus.
 Robert T. Lemon, II, New Orleans, La., for Adnac, et al.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before WISDOM, HIGGINBOTHAM and DAVIS, Circuit Judges.
 W. EUGENE DAVIS, Circuit Judge:
 
 
 1
 This litigation stems from the partial flooding of the M/V ORIENT TRADER as it was onloading grain at the St. Charles Grain Elevator in New Orleans, Louisiana. Korea Maritime Transport Co., (KMTC), the owner of the ORIENT TRADER, appeals the judgment of the district court awarding damages to Louis Dreyfus Corp. (Dreyfus), the charterer of the ORIENT TRADER and to Adnac, Inc., the owner of the St. Charles Grain Elevator. KMTC also challenges the district court's rejection of its claims for earned freight and general average. Adnac cross-appeals arguing that the district court erred in finding that the liquidated damage clause in the docking tariff agreement is unenforceable. We find no error and affirm.
 
 I.
 
 2
 Dreyfus time chartered the ORIENT TRADER from KMTC. The charter party provided for loading approximately 52,000 long tons of grain onto the vessel in New Orleans for delivery to Japan. The charter agreement includes a USA Clause Paramount that makes the provisions of the Carriage of Goods by the Sea Act, 46 U.S.C. Sec. 1300 (COGSA) applicable to any dispute arising between Dreyfus and KMTC.
 
 
 3
 The ORIENT TRADER arrived in New Orleans and commenced loading at the St. Charles Grain Elevator on February 17, 1984. Three days later, while loading was still in progress, the engine room flooded because of an open valve in the seawater cooling system. Both Dreyfus and Adnac filed lawsuits to recover damages incurred as a result of this flooding.
 
 
 4
 It is largely undisputed that the flooding on the ORIENT TRADER was caused by a defect in the ship's seawater cooling system. The principal controversy at trial concerned whether the vessel owner or crew should have discovered and corrected the defect. Consideration of this issue requires some understanding of the operation of the cooling system on the ORIENT TRADER.
 
 
 5
 The ORIENT TRADER's engines and generators are cooled with fresh water which in turn is cooled by seawater. Seawater enters the vessel through two large openings located below the waterline on the ship's starboard side. Sea water enters these openings and is carried through pipes to a heat exchanger (radiator) where the sea water cools the heated fresh water. The sea water is then discharged overboard.
 
 
 6
 Before entering the heat exchanger, the sea water passes through a strainer designed to filter out any sea debris. The steel-mesh basket contained in the strainer housing requires periodic cleaning. In order to clean the strainer, a crewmember must remove a cover plate located in the engine room that permits access to the strainer housing. Because the cover plate's removal would allow sea water to enter the engine room, the system is equipped with manual and hydraulic valves which prevent seawater from entering the strainer housing while the strainer itself is being cleaned. Crew members operate the hydraulic valves through a control panel that registers a green light when the valves are closed (isolating the strainer) or a red light when the valves are open (permitting sea water to enter the strainer housing).
 
 
 7
 In addition to the indicator lights and switch position on the control panel, the valve position can be confirmed by inspecting a mark machined on the top of actuator stem. The actuator is the mechanism that controls the actual opening and closing of the valve by means of a disc contained in the pipe. Mated directly to the valve stem, the actuator stem supplies a direct mechanical reading of the valve disk position by way of the machined mark on the exposed end of the stem.
 
 
 8
 A final safety feature is located on the top of the strainer housing in the form of a plug. By loosening this plug, a crew member can discover whether pressurized water is still entering the strainer. If the water in the strainer is under pressure, the crew member can easily replace the plug and close the valves before opening the intake pipe.
 
 
 9
 While the ORIENT TRADER was under construction, the shipbuilder encountered numerous problems with the cooling system. During tests of the system, the control panel's indicator lights and the activator spindle shaft mark gave conflicting readings. When the spindle shaft indicated that the valves were closed, the control panel light was green, indicating that the valves were open. Realizing that either the control light or the spindle shaft mark was set incorrectly, the builder assumed that the control panel was accurate and modified the spindle shaft mark accordingly. Unfortunately, the builder's assumption was wrong. After the modification neither the spindle shaft mark nor the light registered the correct valve position.
 
 
 10
 On the date of the accident, the ORIENT TRADER was only on its second voyage and the ship's first engineer endeavored to remove the strainer for the first time. Observing that the lights on the remote panel were green and that the spindle shaft mark showed that the valves were closed, the engineer began to remove the wing nuts from the strainer cover. After removing six of the eight wing nuts, the pressure forced the cover off and water began to flood the engine room.
 
 
 11
 Upon being informed of the flooding, Adnac ordered the ship to vacate its loading berth at 1740 CST on February 20. The ship, however, was under an order by the Coast Guard not to move and thus could not comply with this instruction until February 23.
 
 
 12
 Dreyfus filed suit against: (1) the ORIENT TRADER (in rem); (2) KMTC as the owner of the vessel; (3) Samsung Shipping and Heavy Industries, Ltd. (Samsung), the ship builder; and (4) Superfos Hydraulic A/S (Superfos), the manufacturer of the seawater valve system. KMTC counterclaimed against Dreyfus claiming it was entitled to freight earned and contribution in general average. Adnac brought a separate suit against the ORIENT TRADER (in rem) and KMTC to recover damages resulting from the ORIENT TRADER's failure to vacate the loading berth on February 20.
 
 
 13
 Following trial of the two actions (consolidated by the district court), the court: (1) found that KMTC failed to exercise due diligence to provide a seaworthy vessel and rendered judgment in favor of Dreyfus and against KMTC and the ORIENT TRADER; (2) found that KMTC breached its Berthing Agreement with Adnac and awarded damages to KMTC for the breach; (3) dismissed Dreyfus' suit against Samsung and Superfos; and (4) denied KMTC's claim against Dreyfus for earned freight and general average.
 
 
 14
 On appeal, KMTC argues that: (1) the district court's finding that KMTC failed to exercise due diligence to make the ORIENT TRADER seaworthy is clearly erroneous; (2) the district court erred in refusing to apportion fault between Samsung, Superfos and KMTC; (3) the district court erred in refusing to enforce the earned freight and general average provisions of its charter party with Dreyfus; and (4) the district court awarded excessive damages to Dreyfus and Adnac.
 
 
 15
 In Adnac's cross-appeal, it argues that the district court erred in failing to enforce the liquidated damage clause in the Berthing Agreement.
 
 II.
 A.
 
 16
 Dreyfus initially argues that KMTC filed a premature notice of appeal in the district court and that, because no later notice of appeal was filed, this court lacks jurisdiction.
 
 
 17
 Judgment was entered by the trial court on July 1, 1986. Within ten days, Dreyfus filed a motion requesting the district court to amend its findings and judgment to include an award of attorney's fees. On July 30, while the motion was still under advisement, KMTC filed a notice of appeal. On August 1, the district court denied Dreyfus' motion for attorney's fees. No new notice of appeal was filed by KMTC following the August 1 ruling.
 
 
 18
 Federal Rule of Appellate Procedure 4(a)(1) provides that the notice of appeal from the district court judgment "shall be filed ... within 30 days after the date of entry of the judgment or order appealed from." Compliance with the filing requirement is mandatory and must be followed to vest jurisdiction in this court over the appeal. Browder v. Director, Dept. of Corrections, 434 U.S. 257, 264, 98 S.Ct. 556, 561, 54 L.Ed.2d 521 (1978).
 
 
 19
 At issue here is the narrow question of whether Dreyfus' motion to amend the July 1 judgment to seek attorney's fees precluded appeal from that judgment until the motion was resolved. In Holmes v. J. Ray McDermott & Co., 682 F.2d 1143, 1146 (5th Cir.1982), cert. denied, 459 U.S. 1107, 103 S.Ct. 732, 74 L.Ed.2d 956 (1983), this court articulated when a post-judgment request for attorney's fees may preclude entry of final judgment:
 
 
 20
 The determination of finality has ... hinged upon whether the award of attorney's fees was, in a particular action, similar to an application for costs, a part of the relief sought, or a collateral or independent claim that is neither a part of the relief sought or costs.
 
 
 21
 Id. at 1146. In Holmes, the court set forth three factors to assist in determining whether attorney's fees are an integral part of the merits of an action: (1) whether attorney's fees are an element of damages which may be recovered; (2) whether attorney's fees were requested in the complaint or in the pretrial order; and (3) whether the jury was charged on the issue of attorney's fees and returned a verdict awarding them. Id. at 1147.
 
 
 22
 Applying these factors to the facts of this case, we conclude that attorney's fees are not an integral part of the merits in this action. First, attorney's fees are not an element of damages recoverable under the Carriage of the Goods by the Sea Act, 46 U.S.C. Sec. 1300. Noritake Co. v. M/V HELLENIC CHAMPION, 627 F.2d 724, 730-31 (5th Cir.1980). No authority has been cited that persuades us that they are recoverable in this case. Second, Dreyfus did not request attorney's fees in its complaint, nor did it seek this relief in the pretrial order. Finally, Dreyfus' claim for attorney's fees was not presented to the court during the trial. We conclude, therefore, that Dreyfus' claim for attorney's fees was collateral to the principal action and did not preclude the district court from entering final judgment on July 1. It follows that the July 30 appeal was a timely, effective appeal of that judgment.
 
 B.
 
 23
 On the merits of the appeal, KMTC first argues that the district court's finding that it failed to exercise due diligence to make the ORIENT TRADER seaworthy is clearly erroneous. The time charter between Dreyfus and KMTC incorporates the Carriage of the Goods by the Sea Act, 46 U.S.C. Sec. 1300 (COGSA), through a U.S.A. Clause Paramount.[1] COGSA requires the carrier to exercise due diligence to make the vessel seaworthy:
 
 
 24
 The carrier shall be bound before and at the beginning of the voyage, to exercise due diligence to--(a) Make the ship seaworthy; (b) Properly man, equip, and supply the ship ...
 
 
 25
 46 U.S.C. Sec. 1303(1)(a) & (b); see also 2A Benedict on Admiralty Sec. 82 at 8-2 (7th ed.1986); International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 21 S.Ct. 591, 45 L.Ed. 830 (1901).
 
 
 26
 The district court found that KMTC failed to exercise due diligence to make the ORIENT TRADER seaworthy before the commencement of its intended voyage from New Orleans, Louisiana, to Japan in three respects:
 
 
 27
 (1) KMTC failed to detect during the ORIENT TRADER's construction that the control panel and spindle shaft mark did not supply accurate readings on the position of the valve disk.
 
 
 28
 (2) KMTC failed to detect the problem with the control panel and spindle shaft mark during the ORIENT TRADER's dock and/or seatrials.
 
 
 29
 (3) KMTC's crew failed to exercise due diligence in removing the sea strainer cover.
 
 
 30
 KMTC first challenges the district court's finding that KMTC's failure to correct the control light and spindle shaft marks during construction was a breach of its duty to exercise due diligence.
 
 
 31
 Paul Anderson, a Superfos service engineer, testified at trial that he discovered and warned KMTC personnel that the spindle shaft mark and remote panel control light did not accurately reveal the position of the valve disc. KMTC argues that the district court erred in crediting this testimony because: (1) he never recorded (as required under Samsung procedures) the problem in any of his inspection reports after his April 13 hydraulic inspection with KMTC representatives; (2) at an earlier deposition Anderson stated that he did not remember if he had warned KMTC personnel of the misalignment; (3) two Samsung quality control men who attended the same inspection attended by KMTC personnel stated that Anderson assured them that there was no problem with the system; and (4) KMTC's inspector, Park, testified that when he inspected the vessel the actuator stem mark was synchronized with the control panel indicator lights.
 
 
 32
 After hearing all of the evidence, the district court decided to credit Anderson's testimony. Anderson testified unequivocally at trial that he warned KMTC personnel that the control light and spindle shaft marks did not accurately reflect the valve disk position.[2] Assessing a witness' credibility is within the province of the district court and the facts in this case do not show that the district court's decision to credit Anderson's testimony was clearly erroneous. Anderson v. Bessemer City, 470 U.S. 564, 574-75, 105 S.Ct. 1504, 1512-13, 84 L.Ed.2d 518 (1985).
 
 
 33
 KMTC also challenges the district court's finding that it failed to exercise due diligence in testing the system during dock and sea trials. KMTC argues that there was no reason to test for inaccurate or inconsistent signals from the valve control light and spindle shaft mark because (1) the engine cooling system worked properly during seatrials and (2) the ORIENT TRADER was approved by both the American Bureau of Shipping and Korean Register, two vessel classification societies.
 
 
 34
 Compliance with a classification society survey does not necessarily establish due diligence. Fireman's Fund Ins. Co. v. M/V VIGNES, 794 F.2d 1552, 1556 (11th Cir.1986). The extent to which the crew should have tested the seawater cooling system during dock and sea trials is a question of reasonableness under the circumstances. We cannot say that the district court committed clear error in finding that the crew failed to exercise due diligence in failing to adequately test the accuracy of the control panel lights and actuator spindle shaft mark in registering the position of the valve disc.
 
 
 35
 Finally, KMTC challenges the district court's finding that the KMTC's crew failed to exercise due diligence in removing the strainer cover. The court concluded that "immediately prior to removing the cover from the sea strainer body, [KMTC's crew] failed to use due diligence in not first unscrewing the vent plug on the sea strainer to see if the system was under pressure." This finding is not clearly erroneous.
 
 
 36
 At trial, Mr. Stickney, a marine surveyor, testified that, if available, a crewmember should use the plug to test whether the strainer cover is under pressure. Mr. Sargent, Superfos' expert in marine and naval architecture, also testified that the engineer should have checked the vent plugs. The district court has wide latitude in determining whether to credit a witness' testimony. Anderson, 470 U.S. at 574-75, 105 S.Ct. at 1512-13, 84 L.Ed.2d 518 (1985). Once it determined to credit the testimony of Messrs. Stickney and Sargent, the district court's finding that the ORIENT TRADER's crew failed to show due diligence is not clearly erroneous.
 
 
 37
 KMTC also argues from Sec. 1304(2)(a)[3] of COGSA that, even if the crew failed to exercise due diligence in removing the sea strainer cover, KMTC is not liable since that provision exonerates a vessel owner for defaults by the crew performed "in the navigation or management of the vessel." International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 21 S.Ct. 591, 45 L.Ed. 830 (1901), rejected a similar argument. In International Navigation Co., the question presented was whether the owner was liable for a vessel's unseaworthy condition after crew members left a hatch open before the commencement of the voyage. The shipowner argued that it had no liability because the act of opening the hatch was an act of "management of the vessel" under the Harter Act.[4] The Supreme Court rejected the ship owner's argument stating that:...[E]ven if the loss occur through fault or error in management, the exemption cannot be availed of unless the vessel was seaworthy when she sailed, or due diligence to make her so had been exercised; and it is for the owner to establish the existence of one or the other of these conditions. The word "management" is not used without limitation, and is not, therefore, applicable in a general sense as well before as after sailing.
 
 
 38
 Id. at 226, 21 S.Ct. at 594. Because the critical error of the engineer in this case occurred before the commencement of the voyage, KMTC is not shielded from liability by Sec. 1304(2)(a).
 
 C.
 
 39
 KMTC next argues that the district court erred in failing to apportion fault between Samsung, Superfos and KMTC.
 
 
 40
 The district court found that it had no reason to apportion fault between Samsung, Superfos and KMTC because: (1) Dreyfus' claims against Samsung and Superfos are barred under Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), and (2) KMTC's cross-claims against Superfos and Samsung are barred because KMTC, Samsung and Superfos, in their respective contracts, agreed to arbitrate any disputes.
 
 
 41
 KMTC first argues that the district court erred in dismissing Dreyfus' claim against Samsung and Superfos under Robins Dry Dock. The district court correctly held that this argument is foreclosed by this court's recent decision in Cargill, Inc. v. Doxford & Sunderland, Ltd., 782 F.2d 496 (5th Cir.1986). In Cargill, the defendant, Bethlehem Steel, repaired the engine thrust block on the M/V SERENA. The SERENA later was disabled by engine failure while transporting Cargill's grain. Rather than allow its cargo to deteriorate while the engine was being repaired, Cargill removed the perishable grain from the vessel. Cargill then charged Bethlehem (and others) with negligence in repairing the SERENA's engine. In rejecting Cargill's claim, we stated:
 
 
 42
 The only relevant difference between this case [Robins Dry Dock ] and the case at bar is that Cargill seeks to extend the protection of the law even further. Whereas the Robins Dry Dock charterers sought only to recover the market value of the vessel's use while she was delayed ... Cargill seeks to recover for all its losses that were in any manner associated with the delay that was caused by the malfunction of the SERENA's engine. Because the charters in Robins Dry Dock were prohibited from recovering in tort against the repair company that caused the delay, Cargill is a fortiori prohibited from recovering against Bethlehem.
 
 
 43
 Id. at 497-98 (citations omitted).[5] KMTC's argument is meritless.
 
 
 44
 KMTC also challenges the district court's ruling denying its cross-claims against Samsung and Superfos because the parties had agreed to resolve any disputes through arbitration. KMTC argues that because Superfos is not a party to the arbitration proceedings, the arbitrator will be hampered in any attempt to allocate fault among the parties.
 
 
 45
 The Supreme Court has directed that all doubts regarding the arbitrability of disputes be resolved in favor of arbitration. As the Supreme Court recently explained:
 
 
 46
 The Arbitration Act establishes that as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.
 
 
 47
 Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983); see also Southland Corp. v. Keating, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). Following the Supreme Court's directive, this court has stressed that arbitration should not be denied "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." Wick v. Atlantic Marine, Inc., 605 F.2d 166, 168 (5th Cir.1979). As this court recently noted in Smoky Greenhaw Cotton Co. v. Merrill Lynch, 785 F.2d 1274, 1279 (5th Cir.1986), arbitration agreements should be enforced "even where those agreements necessarily result in inefficient or duplicative bifurcated proceedings."
 
 
 48
 All parties agree that KMTC and Samsung, as well as Samsung and Superfos, agreed to arbitrate their disputes, and that the arbitration agreements are broad enough to cover both the determination and allocation of fault. A court judgment allocating fault between these parties could prejudice the arbitration process. Place St. Charles v. J.A. Jones Const. Co., 823 F.2d 120, 125-26 (5th Cir.1987). This argument is also meritless.
 
 D.
 
 49
 KMTC next argues that the district court erred in refusing to enforce the freight earned clause of the charter party agreement. KMTC contends that the agreement between it and Dreyfus is a contract for "private carriage," which allows the parties complete freedom to apportion any loss in any manner they choose. Because the charter agreement provides that "freight should be deemed earned on the cargo as loaded on board," KMTC argues that freight on the loaded grain was earned and is recoverable by them.
 
 
 50
 The district court rejected KMTC's claim for earned freight on grounds that such a recovery is inconsistent with the contract's requirement that the vessel owner exercise due diligence to provide a seaworthy vessel at the outset of the voyage.
 
 
 51
 The charter agreement incorporates COGSA by including a U.S.A. Clause Paramount. The U.S.A. Clause Paramount is the usual method parties use to incorporate COGSA in a charter party; the clause renders invalid all terms of the contract which are inconsistent with the provisions of the Act.[6] See 2A Benedict on Admiralty Sec. 43 at 5-3.
 
 
 52
 Under COGSA, a carrier owes a nondelegable duty to exercise due diligence to provide a seaworthy vessel. Allowing recovery of earned freight by a carrier that breaches its duty to provide a seaworthy vessel is inconsistent with this duty and with COGSA. Mare Schiffahrtskontor GmbH & Co. v. M/V OCEANHAVEN, 763 F.2d 633, 637 (4th Cir.1985); Merchants Corp. of America v. Nine Thousand Six Hundred Fifty-Five Long Tons, 238 F.Supp. 572, 574 (S.D.Tex.1965); cf. Amoco Transp. Co. v. S/S MASON LYKES, 768 F.2d 659, 662-63 n. 4 (5th Cir.1985). KMTC's claim is meritless.
 
 
 53
 KMTC, relying on a "New Jason Clause"[7] in its charter agreement, also argues that the district court erred in denying its claim against Dreyfus for general average. The New Jason Clause requires the cargo owner to contribute to general average even if the loss is caused through the fault of the vessel before the commencement of the voyage. KMTC again argues that because the parties are governed by a private charter agreement, they are free to contract as they wish on their respective general average obligations even though the damage incurred is caused by failure to exercise due diligence in making the vessel seaworthy. The district court denied KMTC's claim for general average because: (1) the "New Jason Clause" does not apply if the carrier is responsible under COGSA, and (2) under COGSA, a carrier cannot claim general average if its failure to provide a seaworthy vessel causes the loss.
 
 
 54
 Orient Mid-East Lines, Inc. v. A Shipment of Rice, 496 F.2d 1032 (5th Cir.1974), cert. denied, 420 U.S. 1005, 95 S.Ct. 1447, 43 L.Ed.2d 763 (1975), rejected a similar argument on facts indistinguishable from those presented here. In Orient Mid-East Lines, Inc., we held that the vessel owner is not entitled to contributions to general average from cargo under the New Jason Clause when the damage incurred is caused by the vessel owner's failure to exercise due diligence to make the vessel seaworthy. Specifically, we held that (1) the New Jason Clause was not intended "to create a new species of general average," id. at 1038; (2) allowing a carrier to recover general average after breaching its duty to provide a seaworthy vessel is inconsistent with the General Average Act, id.; and (3) the New Jason Clause is inconsistent with COGSA, id. at 1039.
 
 E.
 
 55
 KMTC contends next that the $759,577.23 damage award to Dreyfus is excessive. Following the flooding, Dreyfus learned that the ORIENT TRADER could not sail for four to six weeks. Dreyfus determined that it could not wait until the ORIENT TRADER was repaired and still meet the delivery schedule in its contract with its Japanese customer, Marubeni. Dreyfus therefore unloaded the ORIENT TRADER's grain and sold it at a reduced price to a buyer in New Orleans. Dreyfus sold the remaining grain (that it had agreed to purchase from Tabor for shipment on the ORIENT TRADER) to Continental Grain Co. also at a reduced price. To meet its delivery schedule in Japan, Dreyfus purchased additional grain and transported it by rail to Kalama, Washington. That grain was then shipped by Dreyfus from Kalama to Marubeni, in Japan.[8]
 
 
 56
 KMTC challenges the district court's $95,079.01 award to Dreyfus for the additional costs incurred in executing its wheat purchase agreement with Tabor and the $232,823.98 award for the increased cost of executing its contract with Marubeni. KMTC argues that it had no reason to know that Dreyfus was under a strict time limit either to buy the grain from Tabor or to deliver the grain to its customer, Marubeni. Accordingly, KMTC argues that the Dreyfus' costs in fulfilling its obligations to Tabor and Marubeni were not foreseeable and thus not recoverable.
 
 
 57
 The district court rejected this argument because it concluded that KMTC knew or should have foreseen that its breach of the charter party would interfere with Dreyfus' contracts to purchase and sell grain. Specifically, the district court noted that:
 
 
 58
 (1) These collateral contracts were "typical of the grain industry" and "were necessarily within the contemplation of contracting parties, such as KMTC, who chartered vessels to grain companies;"
 
 
 59
 (2) Had the casualty not occurred, order bills of lading would have been issued "so that the shipper may negotiate the documents to effect the sale of the cargo to a third party," thereby placing KMTC "on notice that Dreyfus had either sold or intended to sell the cargo to a third party buyer;" and/or(3) The charter party agreement between KMTC and Dreyfus "contained a cancelling date, a standard feature to all charters made by domestic grain export companies" which "gave KMTC construction notice, at the very least, of Dreyfus' respective purchase/sale/obligation, albeit to unknown sellers/buyers."
 
 
 60
 The district court was entitled to find that the damages Dreyfus incurred under its grain sales and purchase agreements with Tabor and Marubeni were foreseeable. Mr. Lucas, Dreyfus' Director of Logistics and Operations, testified that: (1) the collateral contracts between Tabor and Dreyfus and Marubeni and Dreyfus are typical of the grain industry and within the contemplation of contracting parties, such as KMTC, who charter vessels to grain companies; (2) if the loading had been without incident, KMTC would have received a bill of lading that would have informed it that Dreyfus had either sold or intended to sell the cargo to a third-party buyer at its Japanese destination; and (3) cancellation dates in charter agreements for transport of grain are standard and are inserted because of the usual time constraints in both purchases and sales of grain. This testimony supports the district court's finding that the inclusion of a cancellation date in Dreyfus' charter party
 
 
 61
 was to permit Dreyfus to have sufficient notice of the vessel's inability to timely arrive at a loading port, thus enabling Dreyfus to obtain a substitute vessel so it could perform both its purchase and sale obligations timely and without penalty. The cancelling date therefore gave KMTC constructive notice, at the very best, of Dreyfus' prospective purchase/sale obligations, albeit to unknown sellers/buyers.
 
 
 62
 We conclude that the district court was entitled to find that the damages resulting from Dreyfus' collateral agreements with Tabor and Marubeni were foreseeable.
 
 F.
 
 63
 In its cross-appeal, Adnac contends that the district court erred in holding that the Berthing Agreement's liquidated damage clause, imposing a $30,000 per day charge for failing to vacate the loading berth, constitutes an unenforceable penalty. Adnac argues that the clause is enforceable because it constitutes a reasonable estimate of likely injury resulting from an untimely vacating of the loading dock.[9]
 
 
 64
 Whether a liquidated damage provision constitutes a penalty is a question of law. Board of Trustees v. Wood, 779 F.2d 1106, 1107 (5th Cir.1986). This court applies the two-part test set forth in the Restatement (Second) of Contracts Sec. 356, comment b, to determine whether a liquidated damage clause constitutes a penalty.
 
 
 65
 The first factor is the anticipated or actual loss caused by the breach. The amount fixed is reasonable if it approximates the actual loss that has resulted from a particular breach, even though it may not approximate the loss that might have been anticipated under other possible situations, or if the breach approximates the loss anticipated at the time of the making of the contract, even though it does not approximate the actual loss .... The second factor is the difficulty of proof of loss. The greater the difficulty of proof of loss, the more flexibility is allowed in approximating the anticipated or actual harm.
 
 
 66
 Farmers Export Co. v. M/V GEORGIS PROIS, 799 F.2d 159, 162 (5th Cir.1986) (enforcing a $5,000 per hour docking tariff).
 
 
 67
 The agreement imposes a $30,000 docking charge for each calendar day or fraction of a calendar day. The only witness on the reasonableness of the docking charge was Warren Duffy, the general manager of the grain elevator. Duffy testified that $30,000 is the approximate cost of running the elevator for a twenty-four hour period. He also testified that the actual damage sustained by the elevator in this case for the loss of 61.2 hours in elevator use was $70,167.85 or $1,146.53 per hour.[10]
 
 
 68
 Adnac, on appeal, argues that the liquidated damage clause approximates the loss anticipated at the time the agreement was made. We disagree. The evidence establishes that the reasonable pre-estimate of damages is $30,000 for a full calendar day or a twenty-four hour period. The district court was entitled to find that Adnac's charge of $30,000--the cost of running the elevator for twenty-four hours--is excessive when the vessel occupies the berth for a much shorter time. Under the agreement if a vessel occupied the berth for one hour Adnac could recover twenty-four times its actual anticipated cost. By imposing the $30,000 figure for periods of less than twenty-four hours, the contract fails to approximate the loss anticipated for such periods.
 
 
 69
 KMTC also argues that because the Coast Guard ordered the ORIENT TRADER to remain at the elevator berth, its contractual obligation to vacate the berth is excused by the impossibility of performance. This argument is meritless. The doctrine of impossibility does not apply unless the party asserting the defense is free from fault. Restatement (Second) Contracts Sec. 261, comment d. In the instant case, the Coast Guard's order resulted from KMTC's failure to exercise due diligence in making the vessel seaworthy.
 
 
 70
 AFFIRMED.
 
 
 
 [1]
 The U.S.A. Clause Paramount provides:
 This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.
 
 
 [2]
 Anderson testified that:
 Q. What, if anything, did you do as a result of the situation you saw?
 A. I called the Mr. Lee, but as Mr. Lee does not speak very good English or doesn't seem to understand, I got hold of another Mr. Lee, who I know his name is K.G. Lee and he is assistant manager for the electrical department for the yard.
 Q. First, you talked to Mr. Lee whose initials you can't remember, right?
 A. Yes, sir.
 Q. And then, you talked to K.G. Lee of Samsung?
 A. Yes, sir.
 Q. What did you tell these gentlemen?
 A. I told them that this activator was turned 90 degrees from the position which shows in our drawings and I asked them to correct same.
 Q. What do you mean, correct the same, what did you ask them to do?
 A. What happens, when you turn an activator 90 degrees, then the indicator mark on the top of the activator will show opposite.
 Q. So, what did you tell them to do?
 A. To change the marking.
 Q. Did you ask them to do anything else?
 A. No, sir, it isn't my business to do that. I can only instruct them--
 Q. Did you give these same advices to Mr. Park sitting here, who is present on behalf of the owners of the vessel, KMTC?
 A. Yes, on the 13th of April, when we had a final test with owner use and Samsung and myself.
 Q. You told Mr. Park the same thing you told Mr. Lee, and Mr. Lee that is, to remark the actuator spindle.
 A. I can't order Mr. Park to change, but I can advise him if something is wrong.
 Q. I understand that, did you advise him of the situation?
 A. Yes, sir.
 Vol. 9 Trial Trans. at 390-92.
 
 
 [3]
 This section of COGSA provides in part: "Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from--(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship; ..." 46 U.S.C. Sec. 1304(2)(a)
 
 
 [4]
 The pertinent portion of Section 3 of the Harter Act provides:
 If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, the owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel ...
 46 U.S.C. Sec. 192. Although the Harter Act uses a somewhat different phraseology than COGSA, the scope of the exemption from liability for negligence in the navigation and management of the ship is identical to that provided in COGSA. See G. Gilmore & C. Black, The Law of Admiralty Sec. 3-29 at 156 (2d ed. 1975).
 
 
 [5]
 KMTC also argues that the recent Supreme Court decision in East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), modified this court's decision in Cargill. KMTC argues that East River establishes that Dreyfus may assert a maritime tort claim against Samsung and Superfos because the defective vessel damaged the cargo, which is "other property."
 This argument is meritless. Robins Dry Dock addresses the issue presented in this case: whether Dreyfus' losses are too remote to justify a tort action against Samsung and Superfos. East River, on the other hand, deals with the limitation on the purchaser's (KMTC) tort action against the product manufacturer for damage to the product itself.
 
 
 [6]
 See supra note 1
 
 
 [7]
 The pertinent portion of the New Jason Clause provides:
 In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise the goods, shipper, and consignees or owners of the goods shall contribute with the carrier in general average ....
 
 
 [8]
 The district court assessed Dreyfus' total damages at $759,577.23, itemizing the damages as follows:
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 [9]
 The pertinent portion of the tariff provides:
 In addition, on account of the difficulty of quantifying damages if the vessel fails to vacate the berth when ordered, the owner/master/agent of such vessel agrees to pay, as liquidated damages, the sum of $30,000 per day for each calendar day or fraction of calendar day by reason of the vessel's failure to vacate the berth when ordered.
 
 
 [10]
 Duffy's testimony that the cost of running the elevator is $30,000 per day is consistent with his testimony that the actual loss sustained is $70,167.85. The $70,167.85 figure is the loss sustained in a four calendar day period which covered only 61.2 hours. The district court in effect found that the hourly cost of running the elevator was $1,146.53; thus, for a full calendar day or a twenty-four hour period, the loss sustained is $27,516.72. The $30,000 estimate in the tariff agreement is, therefore, a close approximation of the loss sustained by the elevator in a twenty-four hour period