**DREW AMEROID INTERNATIONAL Plaintiff,**

v.

**M/V GREEN STAR, engines, boilers, tackle, etc., In Rem, and Kukje Shipping Company Limited, In Personam, Defendants.**

**KINGSTATE OIL, Plaintiff,**

v.

**KUKJE SHIPPING COMPANY LIMITED, Defendant.**

**DAEWONSA INTERNATIONAL, INC., Plaintiff,**

v.

**KUKJE SHIPPING COMPANY LIMITED, Defendant.**

Nos. 86 Civ. 6020 (CSH), 86 Civ. 6050 (CSH).

United States District Court, S.D. New York.

March 9, 1988.
As Corrected March 22, 1988.

Cardillo & Corbett, New York City (Tulio R. Prieto, of counsel), for Kingstate Oil.

Poles, Tublin, Patestides & Stratakis, New York City (Alan Van Praag, Michael O. Hardison, of counsel), for Drew Ameroid Intern. Inc.

Chichanowicz, Callan & Keane, New York City (William P. Byrne, of counsel), for Nissho Iwai American Corp.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City (Martin B. Mulroy, of counsel), for Daewonsa Intern., Inc.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This admiralty litigation arises out of a voyage that never took place.

By voyage charterparty dated July 11, 1986, Kukje Shipping Co., Limited, a Korean corporation and owner of the M/V Green Star ("Kukje") contracted with Nissho–Iwai American Corporation ("NIAC") as charterer to load on the vessel at "New

York Harbor" a full cargo of steel scrap for carriage to a South Korean port to be designated by NIAC.

The parties used the printed Gencon form of voyage charterparty. However, the printed clauses in respect of rate and payment of freight were stricken out, and Addendum No. 1 to the charterparty, also dated July 11, 1986, was substituted. That addendum reads in its entirety as follows:

"IT IS THIS DAY MUTUALLY UNDERSTOOD AND AGREED THAT:

Freight, when due, is payable at the rate of:

Lumpsum Two Hundred Two Thousand and Five Hundred ($202,500.00) Dollars basis one load port and one discharge port.

Freight payable in U.S. currency in New York. Freight deemed earned as cargo loaded. Ninety-five (95%) percent of freight to be paid within five (5) banking days after completion of loading and surrender of signed Bills of Lading, marked: "FREIGHT PREPAID AS PER CHARTER PARTY", discountless and non-returnable, vessel and/or cargo lost or not lost. Balance of freight, demurrage/despatch to be settled within twenty (20) days after completion of discharge and Owners' presentation of Laytime Statements from load/discharge ports. Charters' privilege to deduct undisputed despatch and brokerage from freight.

ALL OTHER TERMS AND CONDITIONS OF THE CHARTER PARTY TO REMAIN UNALTERED."

On July 18, 1986 the Green Star arrived at Newark, New Jersey, the area within "New York Harbor" designated by NIAC for loading. Loading commenced on July 21, 1986.

It appears that Kukje encountered financial difficulties. On July 29, 1986 a process of maritime attachment issued out of the United States District Court for the District of New Jersey under the Supplemental Admiralty Rules, and was served upon the Green Star. That order of attachment was subsequently amended, *nunc pro tunc* to July 29, 1986, to an arrest of the vessel under Rule C. At the time process of attachment was served on July 29, about 19,000 long tons of cargo had been loaded on the vessel. Subsequent to service of process, an additional 3,578.85 long tons were loaded. The Green Star completed loading on July 31. Kukje issued a bill of lading for the full cargo on that date.

On August 4, 1986, Drew Ameroid International Corporation ("Drew") filed an admiralty action in this Court. Drew alleged that it had supplied chemicals and gases to various vessels owned by Kukje in various ports, and had not been paid for those supplies. On August 5, 1986, a comparable complaint was filed in this Court by Kingstate Oil ("Kingstate"), a supplier of Bunker fuel. Drew and Kingstate applied for *ex parte* writs of attachment, which Judge Stanton granted in Part I. On August 5 1986 those writs were served in this District upon NIAC. The intent of the writs is to attach freight money allegedly owing by NIAC to Kukje under the July 11, 1986 charterparty of the Green Star.

Reverting to the proceedings in the District of New Jersey Kukje failed to lift the writs of attachments against the vessel. On August 28, 1986 the Green Star was sold by the marshal at public auction, and the sale subsequently confirmed by order of District Judge Barry.

According to papers submitted by counsel for NIAC, and nowhere disputed, after the sale of the Green Star her cargo was discharged loaded onboard another vessel, and carried to destination, all at the expense of NIAC.

The last participant in the litigation is Daewonsa International, Inc. ("Daewonsa"), which on June 30, 1987 moved to intervene in the captioned action as a party plaintiff against Kukje. Daewonsa views itself as entitled to intervention as of right under Rule 24(a), F.R.Civ.P.

These consolidated cases are now before the Court on various motions.

NIAC has made a self-styled motion to dismiss the actions of Drew and Kingstate against Kukje or in the alternative for summary judgment. In essence NIAC seeks by this motion a judicial determination that,

in the circumstances of the case, NIAC does not owe freight to Kukje in respect of the cancelled voyage of the Green Star.

Drew and Kingstate challenge NIAC's standing to make such motions, and ask that NIAC be directed to pay the gross amount of the freight contemplated by the July 11, 1986 charterparty between Kukje and NIAC into the registry of the Court, pending further litigation.

Drew and Kingstate also oppose Daewonsa's motion to intervene.

Dealing with that latter point first, I deny Daewonsa's intervention motion. Daewonsa pleads no basis in fact or law for the relief sought.

■ Rule 24(a), whose provisions appear in the margin[1], requires that the intervenor have "an interest relating to the property or transaction which is the subject of the action ..." To establish intervention as of right, the intervenor's interest "must be direct, as opposed to remote or contingent." *Restor–A–Dent Dental Laboratory v. Certified Alloy Products,* 725 F.2d 871, 874 (2d Cir.1984).

■ Daewonsa's proposed intervening complaint against Kukje alleges that it was "the CIF purchaser from the defendant herein" of the scrap cargo at issue. ¶ 2. This cannot be right, since the "defendant" in the action in which Daewonsa seeks to intervene is the shipowner, Kukje, whose only apparent connection with the cargo was that of contemplated ocean carrier. And indeed Daewonsa goes on to allege in its intervening complaint at ¶ 4 that *NIAC* "was the contract seller of the aforementioned steel scrap cargo under a CIF contract...."

Daewonsa further alleges in ¶ 6 the issuance on July 31, 1986 by the vessel's agent of a bill of lading for the entire cargo to NIAC, "which was subsequently negotiated to the consignee bank, and payment was made against letter of credit to the seller of the scrap."

Daewonsa's allegations, together with the uncontroverted averment of NIAC that it paid the costs of substitute transportation after the sale of the Green Star, would seem to establish that Daewonsa has gotten everything it was entitled to. It contracted to purchase the scrap cargo, paid for the cargo on CIF terms, and subsequently received the cargo. To be sure, only one freight should have been paid, and Kukje's default required that a second freight be paid; but NIAC paid that second freight not Daewonsa. It is difficult, at least on Daewonsa's present pleadings, to understand how Daewonsa has a claim against Kukje. It is equally difficult to perceive the requisite "interest" Daewonsa might have in the freights Drew and Kingstate seek to attach in NIAC's hands. NIAC contends that, on a proper construction of the charterparty and the attendant circumstances, it owes no freight to Kukje. Drew and Kingstate disagree. That disagreement gives rise to a justiciable controversy between them with respect to the funds now held under this Court's writs of attachment. However, Daewonsa pleads no cognizable interest in those funds that I can discern, notwithstanding its vague and conclusory allegations of some sort of interest it is entitled to assert.

Accordingly Daewonsa's motion to intervene is denied.

The issue of substance pits Drew and Kingstate, as attaching creditors of Kukje, against NIAC as garnishee.

Drew and Kingstate correctly point out that NIAC, as garnishee, has no standing to move to dismiss their respective complaints against Kukje, or to obtain summary judgment in respect of the underlying merits of their claims against Kukje. However, in fairness to NIAC, that is not really

1. The Rule provides:
    "(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant it so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

NIAC's intent. NIAC contends that it owes nothing to Kukje, and so no indebtedness existed in its hands to be attached. In substance, NIAC asks that the attachments of funds in its hands be vacated. A garnishee has standing to challenge the validity or effect of an attachment of property in its hands. *See* Rule B(3)(a) of the Supplemental Rules.

■ The question therefore becomes whether, given the wording of the charter-party and the other circumstances of the case, NIAC owes freight to Kukje as owner of the Green Star.

Stated more precisely, the issue is whether an earned freight clause such as the one at bar entitles the shipowner to freight where the voyage is never performed, and the cargo never delivered to destination, because unpaid third-party claims against the shipowner result in the arrest and ultimate sale of the vessel at the loading port.

The parties' relatively perfunctory briefs cite no recent authority. The Second Circuit appears never to have addressed this precise issue. But a recent line of cases from other circuits revealed by the Court's research is instructive. *Louis Dreyfus Corp. v. 27946 Long Tons of Corn*, 830 F.2d 1321 (5th Cir.1987); *Amoco Transport Co. v. S/S MASON LYKES*, 768 F.2d 659 (5th Cir.1985); *Mare Schiffahrtskontor v. M/V OCEAN HAVEN*, 763 F.2d 633 (4th Cir.1985).

■ Each case involves an earned freight clause and an uncompleted voyage. Each case stands for the general proposition that "such 'earned freight clauses' do not give the carrier an unqualified right to abandon the voyage and retain the freight." *Amoco Transport Co., supra* at 768 F.2d 662. If an ocean carrier is to abandon the voyage and yet retain the freight, he must "exercise sound judgment, having due regard for the interest of the cargo", *ibid.* Consistent with that principle, *Louis Dreyfus Corp., supra*, recognizes the ocean carrier's "nondelegable duty" to exercise due diligence to provide a sea worthy vessel", and concluded that "recovery of earned freight by a carrier that breaches its duty to provide a sea worthy

vessel is inconsistent with this duty", 830 F.2d at 1321.

Besides standing for these general principles, the Fourth Circuit's holding in *Mare, supra* is close to the case at bar on the facts. *Mare* arose in the same procedural posture. Complaints with writs of maritime attachments and garnishment were commenced by the plaintiff against a number of defendants, including Franco Express Lines S.A., the owner or operator of the vessel Ocean Haven. Plaintiff sought to garnish freight charges allegedly owed by the Trees Company to Franco. The basic issue was "whether Trees has assets of Franco which may be garnished." 763 F.2d at 635. Plaintiff's contention was that Trees was indebted to Franco for freight charges pursuant to a contract of carriage obligating Franco to load a cargo of logs owned by Trees on board the Ocean Haven for carriage from Baltimore to Antwerp. In the course of the voyage to Antwerp, the vessel put into the port of Rotterdam, a scheduled port of call. While at Rotterdam the vessel was seized "for reasons not clear in the record", and the logs eventually arrived in Antwerp "as a result of transshipment arranged by Trees and its customers." 763 F.2d at 636.

The bills of lading covering the shipment provided, in substance, that freight to the place of delivery (Antwerp) "shall be considered completely earned upon receipt of the goods by the Carrier", whether the voyage was completed or not. In these circumstances Mare alleged that freight was owing by Trees to Franco and consequently subject to attachment in aid of Mare's claim against Franco.

The district court concluded *"sua sponte"* (763 F.2d at 635), that Trees was not liable to Franco for the freight charges, and so dismissed the garnishment. The Fourth Circuit reversed and remanded for fuller development of the record. The court of appeals' discussion at 637 is so apt that I quote it at some length:

"The parties agree that under the American rule, in the absence of contractual modification, a shipper is not liable for

freight for carriage of goods by sea until the goods have been delivered to the destination specified in the bill of lading which embodies the contract of carriage between the shipper and carrier. *The Gracie D. Chambers*, 253 Fed. 182, 183 (2d Cir.1918), *aff'd sub nom. International Paper Co. v. Gracie D. Chambers*, 248 U.S. 387, 39 S.Ct. 149, 63 L.Ed. 318 (1919). The parties may, however, agree to lay on the shipper the risk of the ocean voyage, by inserting the bill of lading a guaranteed freight clause which provides that the freight is earned upon loading of the cargo onto the vessel. 253 Fed. at 183. In the instant case the passage from the two bills of lading quoted above clearly records the intent of the parties to modify the American rule to provide that Franco earned the freight upon delivery of the logs to the M/V Ocean Haven in Baltimore.

If that were the extent of this case, then plainly Mare would be entitled to prevail in its garnishments action against Trees. Even if the parties agree to insert a guaranteed freight clause into the bill of lading, however, the carrier's right to the freight is not absolute. "What the parties intend is that the carrier shall keep the freight, even if he does not deliver the cargo, unless the failure to deliver be due to the carrier's fault ..." *The Gracie D. Chambers*, 253 Fed. at 183; *The Malcolm Baxter, Jr. (Republic of France v. French Overseas Corporation)*, 277 U.S. 323, 332–34, 48 S.Ct. 516, 518–19, 72 L.Ed. 901 (1928); *Amoco Transport Co. v. S/S Mason Lykes*, 550 F.Supp. 1264, 1271 (S.D.Tex.1982). Carriers are bound, however, to exercise "reasoned judgment" in the commencement and abandonment of the voyage, that is, judgment "reasonable ... under the circumstances existing and reasonably foreseeable at the time the judgment is made." *T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour*, 629 F.2d 338, 376–77 (5th Cir.1980) (quoting *Orient Mid–East Lines, Inc. v. Cooperative for American Relief Everywhere, Inc.*, 410 F.2d 1006, 1008 (D.C.Cir.1969). Failure to exercise reasoned judgment will

oust the contract of carriage, containing the guaranteed freight clause, and throw the parties back on the general American rule; that is, nondelivery deprives the carrier of the freight. *The Gracie D. Chambers*, 253 Fed. at 183. In appraising the reasonableness of a carrier's judgment to abandon a voyage and discharge the cargo prior to reaching the destination specified in the bill of lading, courts consider "which information was relayed to the carrier, which information it gathered, whether the carrier sought instruction from the shipper, and whether the shipper instructed the carrier." *Amoco Transport Co. v. S/S Mason Lykes*, 550 F.Supp. at 1270.

Against the background of these general principles, Trees as garnishee went on to argue that Franco's commencing the voyage from Baltimore while aware of its financial instability and the consequent risk of an arrest of the vessel *en route* to Antwerp "constituted unreasoned judgment sufficient to oust the guaranteed freight clause and, under the American rule, relieve Trees of any liability for freight." 763 F.2d at 638.

Responding with evident favor to that argument, the Fourth Circuit said:

"Although the parties have not cited and we have not discovered any federal circuit case on point, we believe that the district court correctly concluded that a carrier's commencement of a voyage in the face of financial instability that may force the termination of the voyage prior to its contractual destination could constitute 'unreasoned judgment.' The reasoned judgment rule is applicable in situations when 'the ship's ability to make its voyage was in doubt,' *see T.J. Stevenson*, 629 F.2d at 378, and plainly this ability may be as seriously impaired by financial weakness as by physical weakness. In *Merchants Corp. of America v. 9,665 Long Tons, More or Less of No. 2 Yellow Milo*, 238 F.Supp. 572 (S.D.Tex.1965), a guaranteed freight clause was ousted and the carrier denied the freight because the contracted voyage never occurred 'due to the fault of the shipowner

in permitting the occurrence of conditions giving rise to a libel and then in failing to preserve the financial integrity of the vessel to such an extent as to enable it to remove the libel by bond or other wise.' *Id.* at 574. The vessel in that case was seized by creditor prior to the commencement of the voyage, and the shipper's cargo was unloaded and transshipped by another carrier." *Ibid.* The Fourth Circuit then referred to *Morrisey v. SS A & J Faith*, 252 F.Supp. 54 (N.D.Ohio 1965), as arising in "an analogous context." *Morrisey*, which the parties at bar did cite, held that a shipper could recover prepaid freight from the carrier on a theory of maritime tort, where the carrier breached its duty to use due diligence to furnish a seaworthy vessel, the concept of seaworthiness being expanded to include a shipowner with a multitude of unsatisfied creditors, any one of whom could arrest the carrying vessel, whose owner lacked the resources to free her by paying the third party-claims or posting bond.

The Fourth Circuit remanded Mare to the district court for further proceedings because "the record is barren of any facts as to the specific nature of Franco's financial troubles, the reason for the seizure of the M/V Ocean Haven, and any efforts Franco may have made to forestall the seizure or rescue the vessel." 763 F.2d at 638–69.

I agree with the Fourth Circuit's general statements in *Mare*. Consistent with them, I hold that where a shipowner is so burdened by indebtedness to third parties that its vessels are subject to arrest at any time and in any port, the shipowner cannot receive or retain freight, even under an earned freight clause in the charter party or bill of lading, when an arrest occurs and prevents commencement or

completion of the voyage and delivery of the cargo for whose transportation the freight is payable. While as noted no Second Circuit opinion appears directly on point, the Fourth Circuit in *Mare* found support for its analysis, as do I, in *Silva v. Bankers Commercial Corp.*, 163 F.2d 602, 607 (2d Cir.1947) (carrier liable to shipper for return of prepaid freight when voyage not undertaken after cargo loaded because carrier was unable to obtain sufficient cargo and freights to render the contracted for voyage profitable).

The maritime law prides itself upon equitable traditions and antecedents. To require NIAC to pay freights for a voyage never performed is *prima facie* inequitable, and will be required only if it agreed to a contract compelling such a result. Under the cases cited, I decline to give the earned freight clause in the charter party that effect. Whether the analysis be in terms of reasoned judgment or breach of a duty of seaworthiness, the result is the same.

Since NIAC owes no freight to Kukje in respect of the cancelled voyage of the GREEN STAR, the writs of attachment and garnishment obtained by Drew and Kingstate will be vacated.[2] I will stay entry of an order of *vacatur* for thirty (30) days, in order to permit plaintiffs to file a notice of appeal.

It is SO ORDERED.

---

**2.** Unlike *Mare*, I see no need for further evidence of Kukje's circumstances or the arrest and sale of the Green Star. In *Mare*, the carrying vessel's Rotterdam arrest was apparently shrouded in mystery at the time the district court vacated its writ. Here, the facts are clear enough. Two suppliers, Drew and Kingstate, filed verified complaints in this Court alleging repeated failures by Kukje to pay for necessaries furnished to its fleet at various times in various ports. Apparently Kukje, to induce NIAC to complete post-arrest loading of the Green Star, murmured some reassurances about bank funds. But the funds were never forthcoming, the writs never lifted, and the marshal ultimately sold the vessel at auction. This is a sufficient showing of Kukje's financial condition to warrant application of the principles discussed in text.