John **MORRISEY** et al., Libelants,

v.

S.S. **A. & J. FAITH** et al., Respondents.

No. A64–27.

United States District Court
N. D. Ohio, E. D.

Dec. 1, 1965.

See also D.C., 238 F.Supp. 877.

James F. Dunn, New York City, for intervening libelants, Republic of Pakistan and C. Ranon, Ltd.

Robert B. Preston, Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio, for respondent Grace Lines, Ltd.

CONNELL, Chief Judge.

On May 29, 1964 The Lederer Terminal Warehouse Company filed a libel against and brought to process the SS A. & J. FAITH. This confrontation precipitated a flood of claims for unpaid wages and other alleged breaches of employment obligations, maritime injury, breaches of contracts and failure to pay suppliers and maritime service companies, all of which were consolidated into this cause. To assist the court in assaying the validity and arranging the priority of these myriad claims, we requested the knowledgeable aid of Mr. J. Harold Traverse, who has served arduously and ably in his capacity as Master Commissioner of this consolidated action. The Commissioner has submitted his report for our approval, together with the exception lodged by Grace Lines, Inc. to the Commissioner's determination that the Republic of Pakistan

had a maritime lien senior in right to Grace Lines' preferred ship mortgage. The facts giving rise to this dispute are as follows:

On or about May 2, 1964 the Republic of Pakistan, through its agent Bowring & Company, caused certain cargo to be loaded upon the accused vessel in Ashtabula Harbor, Ashtabula, Ohio, pursuant to a contract of affreightment evidenced by a bill of lading between the Republic of Pakistan, and Pacific Seafarers, Inc., owner of the FAITH. At this time the FAITH was already floundering on the shoals of hopeless insolvency. Her crew was poorly fed and underpaid. Stevedores and suppliers had been irregularly paid since the ship entered the Great Lakes region. There was sparse capital available for upkeep of the ship. The prepaid freight which the owner received from the shipper was quickly dispersed in a token effort to forestall the inevitable,—the seizure and sale of the vessel. Sister ships of the FAITH, owned by the same company, had already been embroiled in litigation which ultimately led Pacific Seafarers to file an application for reorganization pursuant to Chapter XI of the Bankruptcy Act on May 27, 1964, in the Southern District of New York. In short, the Commissioner was fully justified in describing the ship's economic adventures and her owner's financial chicanery as a "shoestring" operation headed full speed for bankruptcy.

It is the contention of the intervening libelant, the Republic of Pakistan, that the solicitation and acceptance of prepaid freights constituted a maritime tort, not merely a breach of contract, so that its claim for the recovery of such freights is entitled to priority over Grace Lines' preferred ship mortgage. Pakistan bases its claim of tortious injury upon two predicates,—first, that the ship as a common carrier has a duty imposed by case law and statute to provide a seaworthy vessel fit to perform the voyage and the breach of that duty gives rise to alternative remedies in tort or contract; second, that the act of the ship owner in accepting a prepayment of freight when hopelessly insolvent, and with no expectation of completing the voyage, constituted a fraud which would give rise to a claim sounding in tort.

The issues which these facts and the arguments of the parties give rise to are as follows:

1. Whether the ship owner as a common carrier has a duty imposed by law to guarantee a seaworthy vessel capable of a complete journey and, if so, whether the breach of such a duty is tortious.

2. Whether the acceptance of the prepaid freights by an already insolvent owner of a vessel, itself beleaguered by a multitude of claims, constitutes actual and/or constructive fraud.

3. Whether such fraud, if any, gives rise to a maritime tort or merely a misfeasance cognizable only in a common law court and not within the jurisdiction of an admiralty court.

4. Whether such fraudulent misconduct, if any, gives rise to an action *in rem* against the vessel or whether the fraud is personal to the owner and giving rise merely to an action *in personam* against the owner of the vessel.

5. Whether a shipper of cargo is required to exercise due diligence to ascertain the financial condition of a vessel or its owner before prepaying freight charges.

■ Before attacking the problems posed by the first issue, we must initially dispose of the Respondent's suggestion that the FAITH and her owner should not be classified as common carriers. Any one who seeks the privilege of transporting for hire the goods of the public must be so classified. As stated by the United States Supreme Court in Liverpool & Great Western Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 437, 9 S.Ct. 469, 470, 32 L.Ed. 788 (1889):

\* \* \* the owner of a general ship, carrying goods for hire, whether em-

ployed in internal, in coasting, or in foreign commerce, is a common carrier * * *.

In the present case the circuit court has found as facts: "The Montana was an ocean steamer, built of iron, and performed regular service as a common carrier of merchandise and passengers between the ports of Liverpool, England, and New York, * * *. By her, and by other ships in that line, the respondent was such common carrier."

█ It cannot be questioned that the ship was engaged in commercial navigation—internal, coastal and foreign—and that the ship through her owners regularly solicited the business of the general public. It is this continuing contact with the public, and the consequent necessity to insure full candor and total fairness in such dealings, which distinguishes the common carrier from the private carrier and imposes added obligations upon the common carrier.

What are the consequences of the carrier's status? Before the codification of rights and duties through the passage of the Carriage of Goods by Sea Act (hereinafter referred to as COGSA), maritime law practically required that the carrier insure the performance of the vessel, excusing him only if non-performance was occasioned by act of God or public enemy. Cf. The Niagara, 21 How. 7, 16 L.Ed. 41 (1859). To partially alleviate the constriction engendered by this doctrine, Congress passed COGSA, 49 Stat. 1207 (1936), 46 U.S.C. §§ 1300–1315. This Act still requires[1] that the carrier must use due diligence to provide a seaworthy vessel and still imposes liability upon the carrier for failure to do so,[2] and repudiates any attempts at limitation of liability for negligence;[3] the Act, however, does mention several exculpatory circumstances which relieve a blameless owner from liability for the ship's non-performance. The pertinent part of that section, for present purposes, exempts the owner when injurious delay is caused by:

Arrest or restraint of princes, rulers, or people, or seizure under legal process. § 1304(2) (g)

█ In pursuit of the favor of this section, the Respondent suggests that the loss inflicted upon the intervening libelant was occasioned by the seizure of the ship pursuant to legal process, and therefore any reliance by the libelant on the duties imposed upon the carrier by COGSA is thwarted by the pardon granted by subsection (g). Cf. The Bruns-

---

1. (1) The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—(a) Make the ship seaworthy; (b) Properly man, equip, and supply the ship; (c) Make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation. (2) The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried.

2. (1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, and to make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation in accordance with the provisions of paragraph (1) of section 1303 of this title. Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.

3. (8) Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect. A benefit of insurance in favor of the carrier, or similar clause, shall be deemed to be a clause relieving the carrier from liability.

wick, 263 F. 907 (E.D.La.1920).[4] Gilmore and Black, however, in their treatise on Admiralty, subscribe to the view that " * * * if the seizure of a vessel comes about through the fault of the carrier he can not have the exemption." (Gilmore and Black, Admiralty 143, fn. 80 (1957)). Likewise, in The Penobscot, 1940 AMC 1217 (D.C.Mass.1940), the court held that where the seizure was instituted by an impatient creditor of the vessel's owner, that owner could not claim the salutory exemption of subsection (g). We deem it the better view which holds the ship liable when its involvement with the delays occasioned by seizure under process and litigation is traceable to a fault of the owner. The Act was passed to ease the vessel owner's onerous task of practically insuring completion of the voyage. Before the Act, the owner was held responsible for many losses without fault. The purpose of this section of the Act is to excuse ships and their owners from underwriting damage sustained by unexpected delays which the owner can neither avoid, anticipate nor prevent. However, when the delay, as in the instant case, is effected by the reckless disregard of the owners for the financial security of the ship and the process is initiated by foreseeable foreclosure actions by justifiably irate creditors, we do not think that the Act can or should excuse the owner from the obligations of his duty as a common carrier.

 Our next consideration is whether the act of accepting cargo and freight charges and lifting anchor when the ship is in precarious financial straits can be construed as a failure to use due diligence to furnish a seaworthy vessel. The connotative ambit of the term "seaworthy" has expanded concentrically in direct proportion to the number of occasions upon which courts have been called upon to interpret it, largely because "the warranty of seaworthiness is a favorite of the admiralty and exceptions to it or limitations upon it, are narrowly scrutinized." Metropolitan Coal Co. v. Howard, 155 F.2d 780, 783 (2nd Cir. 1946, L. Hand, J.) Consequently, in the broadest sense, the ship to be seaworthy must be prepared "in all respects to fulfill the purposes of the voyage." Union Carbide and Carbon Corp. v. The Walter Raleigh, 109 F.Supp. 781, 790 (S.D.N.Y.1951), aff'd 200 F.2d 908 (2 Cir. 1953).

 Ordinarily, the investigation of the seaworthiness of a vessel involves the evaluation of her physical fitness to perform the particular voyage and, in cargo cases, to carry, preserve and deliver the particular cargo. We think, however, that the term should not be limited to merely the physical facilities. The law imposes this obligation so that a ship's owner must make reasonable effort to furnish a vessel which can complete the voyage for which she solicits business. If, when the owner lures a shipper into entrusting cargo to the care of a ship and there is a multitude of unsatisfied creditors, any one of whom can arrest the vessel, and the owner lacks the resources to free her from the arrest of process—either by satisfaction of the claims or the posting of a bond—there can be no reasonable expectation that the vessel will perform the voyage. There is, on the contrary, a strong probability that the voyage will end as did the voyage of the FAITH. If the term "seaworthiness" connotes simply a vessel fit to perform as she promises, and if the strong probability exists that her voyage will be interrupted by litigation, we hold that the vessel is unseaworthy at the start of her voyage. If the owner leaves the vessel unprotected against the foreseeable seiz-

---

4. But in The Estrada Palma, 8 F.2d 103 (E.D.La.1923), the same Judge Foster, while recognizing that the similar exemption contained in the Harter Act (27 Stat. 445) protected an owner in a lawsuit arising out of spoilage caused by seizure of the vessel pursuant to legal process, felt that a significant factor compelling him to grant the exemption was the fact that there was "nothing to show that the vessel was unseaworthy or that the seizure was occasioned by any fault or negligence of the master or owners of the ship." This permits the inference that he would feel differently if the seizure was owing to the fault of the owners.

ure by creditors she is just as liable to be stopped short of her destination as if she were left unprotected against the ordinary perils of navigation. The foreseeable result is the same: interruption or termination of the voyage. If the delay causes damage to the cargo or the forced sale of the vessel results in the loss of prepaid freights, as here, we hold that such an injury to the cargo and its owner gives rise to a claim for the breach of the carrier's duty imposed by section 3(1)(a) of COGSA, 46 U.S.C. § 1303(1) (a).

 Our final determination is whether the breach of the common carrier's duty to furnish a seaworthy vessel gives rise to an action in tort or merely an action in contract. It is axiomatic that the relationship of a common carrier to a shipper and the carrier's attendant duties exist independently of the terms of a contract of affreightment or bill of lading. Whenever the law recognizes the necessity for imposing added safeguards around a consensual relationship in addition to the commitments endorsed by the parties (e. g. physician-patient, trustee-beneficiary, etc.), any disobedience of the law's added commands gives rise to an action *ex delicto*. Thus, the violation of a common carrier's duty, imposed by law to equate the bargaining power between carrier and shipper, sounds in tort. As stated by the Supreme Court, in The John G. Stevens, 170 U.S. 113, 124, 18 S.Ct. 544, 549, 42 L.Ed. 969 (1897):

> But even an action by * * * an owner of goods, against a carrier, for neglect to carry and deliver in safety, is an action for the breach of a duty imposed by the law, independently of contract or of consideration, and is therefore founded in tort.

Cf. also The Penobscot, 1940 AMC 1217, 1235 (D.C.Mass.1940) (dictum); The Henry W. Breyer, 17 F.2d 423 (D.C.Md. 1927).[5]

 It is the opinion of this Court that the loss of prepaid freights incurred by the intervening libelant was caused by the total failure of the owner of the SS A. & J. FAITH to use due diligence to furnish a vessel capable of completing its purported voyage, and that this conduct gives rise to a cause of action sounding in tort and as such the claim of the libelant is a preferred maritime lien within the meaning of 46 U.S.C. § 953(a), and is therefore accorded priority over the preferred ship mortgage of Respondent Grace Lines, Inc., pursuant to the Ship Mortgage Act, 41 Stat. 1004 (1920), 46 U.S.C. § 953(b).

Therefore, we affirm the Commissioner's report in toto, and the exceptions lodged by the Respondent against the finding that the claims of the Republic

---

5. The Commissioner relied heavily on the decision in the *Breyer* case because the facts disclosed there are almost identical with those presented here, and the same claims for prepaid freights were successfully pressed there. In that case Judge Soper found in favor of the libelant on the same basic issue raised here, i. e., that a tort claim arises both with the breach of the common carrier's duty to furnish a seaworthy vessel and by the carrier's fraudulent acceptance of prepaid freights without a reasonable expectation of performing the voyage. Because this decision issued in 1927, before COGSA, the court recognized a different duty from that which we now attach to the common carrier:

> "Having held herself out, through her agents, as such a carrier, it was the first duty of her owners to provide her with reasonable facilities for the transportation of the goods. Having accepted the goods for transportation without notice of inability on her part to perform the service due, the ship was obliged to transport the goods without unreasonable delay." 17 F.2d 423, 429.

Because COGSA amends the carrier's duty to the use of due diligence to furnish a seaworthy vessel, we have not relied upon the *Breyer* decision in determining whether the carrier is in default of its responsibilities under the Act. Rather, our deliberations have been aimed at the question of whether the carrier has breached his obligation to use reasonable means to furnish a seaworthy vessel. Having come to the conclusion, however, that the carrier is guilty of such a breach, we join with Judge Soper and the other above cited authorities in holding that the breach of the common carrier's duty gives rise to an action sounding in tort.

of Pakistan and C. Ranon, Ltd. are preferred maritime liens will be overruled.

Inasmuch as this case may turn in favor of the intervening libelant upon its first contention, it becomes unnecessary for us to examine at length the issues raised by the libelant's argument that the acceptance of prepaid freights by an owner who knows that the ship can not perform the voyage amounts to tortious misconduct.