**CARGILL INC., et al., Plaintiffs,**

and

**Christianssands Skibsassuranceforening, et al., Intervening Plaintiffs,**

v.

**M/T PACIFIC DAWN, et al., Defendants.**

No. 92 Civ. 4987 (JES).

United States District Court, S.D. New York.

Jan. 27, 1995.

Varet & Fink (Stanley McDermott, III, Peter M. Corrigan, of counsel), Hill Rivkins Loesberg O'Brien Mulroy & Hayden (John Ryan, of counsel), New York City, O'Neil, Eichin, Miller, Breckinridge & Saporito (John F. Fay, Jr., William E. O'Neil, of counsel), New Orleans, LA, for plaintiffs.

Nourse & Bowles (Lawrence Bowles, Bruce G. Paulsen, Michael E. Crowley, of counsel), Watson, Farley & Williams (Christopher P. Belisle, of counsel), Burlingham Underwood (Terry L. Stoltz, of counsel), Clark & Atcheson (Frank A. Atcheson, of counsel), Hughes Hubbard & Reed (Steven A. Hammond, of counsel), New York City, for intervening plaintiffs.

Haight, Gardner, Poor & Havens, New York City (Richard G. Ashworth, of counsel), for intervening plaintiff and defendant-claimant.

Nourse & Bowles, New York City (Lawrence J. Bowles, of counsel), for intervening defendant.

## AMENDED MEMORANDUM
## OPINION AND ORDER

SPRIZZO, District Judge.

At issue is whether the plaintiffs or the intervening plaintiff Christianssands Skibsassuranceforening ("Christianssands") is entitled to the remaining Registry Funds plus accumulated interest, which represent the balance of the amount realized from the interlocutory sale of the M/T PACIFIC DAWN.

## BACKGROUND

The plaintiffs are the owners of numerous parcels of vegetable oil loaded on board the M/T PACIFIC DAWN ("vessel") in New Orleans, Louisiana in April 1992 for carriage to various European and Mediterranean ports. *See* Pre–Trial Order ("PTO") ¶ 5(a) at 3; *see also* Verified Complaint at ¶ 6. The intervening plaintiff Christianssands, a mutual insurance company organized under the laws of Norway, served as the vessel's hull underwriter. *See* PTO ¶ 5(a) at 4–5. On or about January 28, 1992, Christianssands issued defendants Great Bear Shipping Company ("Great Bear"), owner of the vessel, and Stamford Tankers, Inc. ("Stamford Tankers") a policy of marine hull insurance valued at $4,000,000 ("policy") which was to be effective from February 1, 1992 through January 31, 1993. *See* PTO ¶ 5(c) at 10. The policy required Christianssands to reimburse Great Bear only for the vessel's share of any general average expenses incurred during a voyage. *See* Plaintiffs' Memorandum in Support of Application for Disbursement of Funds from Court Registry at 2.

On or about June 16, 1992, while the vessel was in the Atlantic Ocean approximately 400 miles from Bermuda, her master reported engine failure and requested assistance. *See* PTO ¶ 5(c) at 10. Through its U.S. agent Scandinavian Marine Claims Office, Inc. ("SMCO"), Christianssands assisted Great Bear and Stamford Tankers in locating a suitable tug to tow the vessel to New York. *See* PTO ¶ 5(c) at 10–11. Through SMCO, Christianssands also assisted in the negotiations for a contract for towing services with World Marine Transport & Salvage, Inc. ("World Marine"), the owner of the tug JUPITERIS ("tug"). *See* PTO ¶ 5(c) at 11.

Thereafter, Great Bear and World Marine entered a "Towhire" International Ocean Towage Agreement (Daily Hire) form contract which provided, *inter alia*, that

> Without prejudice to any other rights which he may have, whether in rem or in personam, the Tugowner, by himself or his

servants or agents or otherwise shall be entitled to exercise a possessory lien upon the Tow in respect of any sum howsoever or whatsoever due to the Tugowner under this Agreement. . . .

See PTO ¶ 5(c) at 11. The contract also provided that the tug's daily rate from departure until return was $7,500.00, *pro rata*, plus certain expenses. *Id.*

The tug departed Norfolk, Virginia on June 19, 1992, and after searching for the vessel, which was adrift and without the necessary electrical power to maintain radio contact, eventually located the vessel and took it in tow on or about June 25, 1992. *Id.*

On that same day, World Marine sent a message by facsimile to SMCO stating that the towage of the vessel had commenced and requesting the "full style of agents in New York." *Id.* On or about June 29, 1992, Stamford Tankers advised SMCO, World Marine and the United States Coast Guard by facsimile that it had nominated the Bill Black Agency ("BBA") of New York as agent for the vessel in New York. *Id.*

On or about July 1, 1992, BBA advised SMCO by facsimile that it required an advance of $33,240 to cover the cost of, *inter alia*, pilotage, docking tugs, docking pilots, dockage, linesmen, customs fees, agricultural users' fees, agency fees and miscellaneous expenses for both the tug and the vessel in the port of New York. *See* PTO ¶ 5(c) at 12. When the vessel's owner and operators failed to advance the funds necessary to allow the vessel and tug to enter the Port of New York, and at the vessel owner's specific request, Christianssands, through SMCO, advanced the $33,240 to BBA to allow the vessel to enter the port. *Id.*

The tug successfully completed the towage and brought the vessel safely to New York. World Marine then billed the master and owner of the vessel $109,964.67 for the tug's services over a period of 13 days, 23 hours and 20 minutes at $7,500 per day, *pro rata*, plus expenses. *See* PTO ¶ 5(c) at 12. When the vessel owner and operators failed to pay for the tug's services, and at the vessel owner's specific request, Christianssands also paid the full amount due to World Marine. *Id.* Having been paid in full by Christianssands, World Marine did not exercise its lien on the vessel. *See* PTO ¶ 5(c) at 13. The value of the cargo upon arrival in New York was $12,000,000. *Id.* The vessel was sold at a judicial sale in the context of this action for $910,000. *Id.* On or about August 26, 1993, counsel for all parties except Christianssands entered into a stipulation, pursuant to which all of the proceeds of the sale of the vessel that remained in the Court's Registry except the amount of Christianssands's claim were disbursed to various parties. *See* Stipulation and Consent Order dated August 29, 1993.

Christianssands' original claim of $143,204.67 has been reduced by the following credits: BBA has refunded to Christianssands $5,566.35 in undisbursed agency fees, PTO ¶ 5(c) at 13; Great Bear's hull insurance policy was cancelled on September 1, 1992, and thus Christianssands owes to Great Bear $17,267 in unearned premium, PTO ¶ 5(c) at 13; *see also* Post–Trial Memorandum of Law of Intervening Plaintiff Christianssands Skibsassuranceforening at 6; and Christianssands owes in general average and salvage-type charges $9,702.13.[1] The remainder, $110,669.19, constitutes the amount Christianssands claims as a salvage lien upon the vessel.

## DISCUSSION

 Under the general maritime law, the relative rank of competing liens is finely calibrated. Competing maritime liens are ranked according to class, the top priority liens being paid out first.[2] As cargo owners,

---

1. Under the hull insurance policy, Christianssands was obligated to pay to its insureds only the vessel's proportionate share of general average and salvage type charges with respect to the above expenses. *See* PTO ¶ 6(b) at 22–23. The vessel's proportionate share of the towage fees and port of refuge expenses ($137,638.32) is arrived at by dividing the value of the vessel ($910,000) by the value of the cargo and the vessel ($12,910,000), which comes to 7.049% or $9,702. *Id.* at 23.

2. The classes are, from highest priority to lowest, the following:

 (1) Expenses of justice during custodia legis;
 (2) Seamen's liens (including those of the Master) for wages; maintenance and cure;

plaintiffs clearly hold fourth priority tort liens. *See Texport Oil Co. v. M/V AMO-LYNTOS,* 11 F.3d 361, 367 (2d Cir.1993) (affirming district court's ruling that "[t]his action under COGSA is a maritime action in the nature of a mixed tort, contract and bailment cause of action"); *All Pacific Trading, Inc. v. M/V HANJIN YOSU,* 7 F.3d 1427, 1433 (9th Cir.1993) ("[w]hen a cargo owner has a direct contractual relationship with the operator of a vessel, the cargo owner has a lien on the vessel for any injury caused by the operator's lack of due diligence"); *Potash Co. of Canada v. M/V RALEIGH,* 361 F.Supp. 120, 123 (D.C.C.Z.1973) ("[t]he Court sustains the position argued by the [cargo owner] that its lien resulting from the failure of the ... voyage charter ... is a lien sounding in tort arising out of the ship's violation of her duties as a common carrier"); *Rayon Y. Celanese Peruana,* 471 F.Supp. at 1371 (cargo claim can always be brought in tort or contract). Because the cargo owners' tort lien exceeds the $111,563.72 that remains in the Registry, Christianssands is entitled to satisfaction of its claim out of the Registry only if its lien takes priority over plaintiffs' as a third priority salvage lien. *See* Stipulation and Consent Order dated August 29, 1993 at 3. For the reasons that follow, Christianssands's lien is not a salvage lien, however, and therefore judgment must be entered for the plaintiffs.

■ Salvage, simply stated, is the "service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger either present or to be reasonably apprehended." *B.V. Bureau Wijsmuller v. United States,* 702 F.2d 333, 338 (2d Cir.1983) (*quoting McConnochie v. Kerr,* 9 F. 50, 53 (S.D.N.Y. 1881), *modified sub nom. McConnochin v. Kerr,* 15 F. 545 (C.C.S.D.N.Y.1883)); *see also The Neshaminy,* 228 F. 285, 288 (3d Cir. 1915). To determine that a salvage service, as distinct from a towing service, was performed, a court must find (1) that the salvaged vessel was in marine peril, (2) that the would-be salvor rendered the service voluntarily, and (3) that the salvage was successful in whole or in part, with the service rendered having contributed to such success. *See B.V. Bureau Wijsmuller, supra,* 702 F.2d at 338; *The "Sabine",* 101 U.S. 384, 25 L.Ed. 982 (1880).

■ Since World Marine successfully towed the M/V PACIFIC DAWN to safety in New York, the third requirement is clearly met. Nevertheless, even assuming, *arguendo,* that the vessel was in "marine peril" at the time that the tug came to its aid,[3] Christianssands's claim, upon which it bases its subrogation to the rights of World Marine, is not a salvage lien because World Marine was not a volunteer. *See B.V. Bureau Wijsmuller, supra,* 702 F.2d at 338 ("voluntary service, the *sine qua non* of marine salvage, is rendered in the absence of a legal duty or obligation"); *The Clarita and The Clara,* 90 U.S. (23 Wall.) 1, 16–17, 23 L.Ed. 146, 150 (1875). Therefore, "whatever motive impels the true volunteer, be it monetary gain, humanitarian purposes or merely error, it will not detract from the status accorded him by law," *B.V. Bureau Wijsmuller, supra,* 702 F.2d at 339, and thus professional salvors—who may perform their services with hopes of monetary gain—may claim salvage

---

and wages of longshoremen when directly employed by the vessel;

(3) Salvage and general average liens;

(4) Tort liens, including personal injuries;

(5) Preferred mortgage liens (U.S. Flag Vessels);

(6) Liens for necessaries under The Maritime Lien Act of 1920;

(7) State-created liens of maritime nature;

(8) Maritime liens for penalties and forfeitures for violation of federal statutes;

(9) Perfected non-maritime liens, including tax liens;

(10) Attaching liens in causes of action within the admiralty and maritime jurisdiction (foreign attachment); and

(11) Maritime liens in bankruptcy.

George L. Varian, *Rank and Priority of Maritime Liens,* 47 Tul.L.Rev. 751, 753 (1973); *Rayon Y. Celanese Peruana v. M/V PHGH,* 471 F.Supp. 1363, 1369 (S.D.Ala.1979); *United States v. One 254 Ft. FREIGHTER, M/V ANDORIA,* 570 F.Supp. 413, 415 (E.D.La.1983), *aff'd,* 768 F.2d 597 (5th Cir.1985).

**3.** "[R]easonable apprehension of injury or destruction if the services are not rendered" is the standard by which peril is adjudged to be present and impending. *Phelan v. Minges,* 170 F.Supp. 826, 828 (D.Mass.1959). Peril necessary to give rise to a claim for salvage must be present or reasonably apprehended, although it need not be immediate or absolute. *Id.* Judged by this standard, the assumption that the M/V PACIFIC DAWN was in marine peril may not be correct.

awards. *The Camanche,* 75 U.S. (8 Wall.) 448, 19 L.Ed. 397 (1869).

Where, as here, a salvor's hopes of monetary gain are transformed from aspirations to a guarantee by a contract of towage, such a contract precludes a claim for salvage. *See Munson Inland Water Lines, Inc. v. Seidl,* 71 F.2d 791, 794 (7th Cir.1934), *cert. denied,* 293 U.S. 606, 55 S.Ct. 123, 79 L.Ed. 697 (1934) (holding that towage contract providing for compensation irrespective of whether the salvage was successful "destroyed [tower's] asserted status as salvors and their liens as salvage liens"). Such towage services rendered at a fixed price, to wit, $7,500 per day, independent of success, give rise only to a sixth priority statutory lien for necessaries, not a lien for marine salvage. *Id.* Accordingly, Christianssands's claim can stand on no better footing than would that of World Marine. It follows that Christianssands cannot receive any Registry Funds until after satisfaction of the cargo owner's superior claims, which exceed the Registry Funds.

## CONCLUSION

For the reasons stated above, judgment shall be entered for the plaintiffs. The Clerk of Court is directed to enter such judgment and to close the above-captioned action.

It is **SO ORDERED.**