THYSSENKRUPP MATERIALS N.A., INC., Plaintiff,

v.

WESTERN BULK CARRIERS A/S, Defendant.

No. 13–CV–1248 (VSB).

United States District Court, S.D. New York.

Signed June 16, 2014.

Harold M. Kingsley, Kingsley Kingsley & Calkins, Hicksville, NY, for Plaintiff.

Patrick F. Lennon, Anne Casey Levasseur, Lennon, Murphy, Caulfield & Phillips, LLC, New York, NY, for Defendant.

### MEMORANDUM & ·ORDER

VERNON S. BRODERICK, District Judge.

Plaintiff Thyssenkrupp Materials N.A., Inc. ("Thyssenkrupp") brought this action to recover losses arising from a three-month delay in shipping cargo from Turkey to the United States due to the seizure by creditors of the vessel Defendant Western Bulk Carriers A/S ("WBC") chartered to complete that voyage, asserting against WBC claims of financial unseaworthiness sounding in both tort and contract. WBC now moves for summary judgment as to both claims. WBC's motion concerning the tort claim of financial unseaworthiness is granted because this tort has not been recognized in this Circuit, and Plaintiff fails to allege the type of damages required under this tort. Defendant's motion directed to the contract claim is denied as premature, as discovery had not been completed at the time of the filing of the motion.

### I. *Background*

On or about February 27, 2012, Thyssenkrupp and WBC entered a charter party contract. (Plf.'s 56.1, ¶ 5; Lennon Decl., Ex. 4.[1]) Pursuant to the charter party, Thyssenkrupp chartered from WBC the vessel M/V Sanko Mineral (the "M/V Sanko" or "Ship") for the purpose of carrying approximately 7,415 metric tons of steel plate from Turkey to the ports of New Orleans and Houston. (Plf.'s 56.1, ¶ 5.) The M/V Sanko was owned at all relevant times by The Sanko Steamship Company of Japan ("Sanko"). (Id. ¶ 1.) WBC chartered the Ship from Sanko and nominated it to perform the voyage under the charter party with Thyssenkrupp. (Id.

¶¶ 2, 13.) After WBC nominated the M/V Sanko, it responded to a Thyssenkrupp questionnaire, which included disclosure of the vessel's ownership. (Id. ¶ 13; see Lennon Decl., Ex. 1 at 6–22.) Thyssenkrupp accepted the M/V Sanko to perform the voyage under the charter party. (Plf.'s 56.1, ¶ 14.)

On May 7, 2012, during the course of that voyage, creditors attached the M/V Sanko pursuant to an *ex parte* order issued by the District Court for the District of Maryland. (Id. ¶ 10; see Lennon Decl., Ex. 6.) The Ship was held in the port of Baltimore for approximately three months, until August 2, 2012. (Plf.'s 56.1, ¶¶ 10, 15; see Lennon Decl., Ex. 8.) Upon release, the Ship completed its voyage and delivered the cargo of steel to the destination ports sometime in August 2012. (Plf.'s 56.1, ¶ 16; Kingsley Decl., Ex. 1 at 5.[2])

Thyssenkrupp claims that it sold the steel at a discount. It claims that on the scheduled arrival date the steel had a market value of $6,582,176.44, but that the intended purchaser rejected the steel because of the delay. (Kingsley Decl., Ex. 1 at 5.) As a result, Thyssenkrupp sold the steel to different buyers at the discounted price of $6,004,964.44, a difference of $577,212.00. (Id.; see Plf.'s 56.1, ¶ 9.) Thyssenkrupp further alleges that four plates of steel, each with a claimed value of $10,834.20, were missing upon discharge in Houston. (Kingsley Decl., Ex. 1 at 5.) Thyssenkrupp does not allege any physical damage to the cargo. (Lennon Decl., Ex. 5 at 5; see Plf.'s 56.1, ¶ 9; Kingsley Decl., Ex. 1 at 5.)

### II. *Procedural History*

Thyssenkrupp filed its Complaint on February 25, 2013, seeking to recover the

---

**1.** "Plf.'s 56.1" refers to Plaintiff's Rule 56.1 Statement. (Doc. 44.) "Lennon Decl." refers to the Declaration of Patrick F. Lennon. (Doc. 39.)

**2.** "Kingsley Decl." refers to the Declaration of Harold F. Kingsley. (Doc. 45.)

difference between the value of the steel when it was scheduled to arrive and the price at which it was sold, the value of the four allegedly missing plates, and attorneys' fees.[3] The Complaint delineates all Thyssenkrupp's claims in a single paragraph:

> The cargo described in Schedule A[4] was lost, damaged and depreciated by defendants[5] due to the fault, neglect, deviation, unseaworthiness, maritime tort, tortious interference with contract, breach of warranty, sinking, stranding, salvage expenses, general average, delay, financial unseaworthiness, breach of contract and conversion of defendants, their agents and servants, and delivered by defendants in non-conforming and contaminated condition, mis-delivered and non-delivered.

(Doc. 1, ¶ 6.) On May 9, 2013, WBC filed an answer to the Complaint generally denying the allegations in the Complaint and asserting various affirmative defenses, among them that WBC exercised due diligence to make the M/V Sanko seaworthy. (Doc. 6 at 4.)

A case management plan was entered on May 10, 2013 (Doc. 8), after which discovery commenced. On October 28, 2013, the case was referred to Magistrate Judge Sarah Netburn for general pretrial purposes. (Doc. 11.) Discovery was scheduled to close on March 18, 2014. (Docs. 27 & 55.)

In November 2013, Thyssenkrupp moved to compel discovery related to WBC's motives in entering into the charter party and in nominating the M/V Sanko. On November 26, 2013, Thyssenkrupp submitted a letter to Magistrate Judge Sarah Netburn outlining its arguments in favor of such discovery, and WBC submitted a response letter on December 7, 2013. (*See* Docs. 16 & 18.) By order dated December 18, 2013, Judge Netburn denied discovery related to WBC's motives on the grounds that such discovery would be relevant only to a tort claim for financial unseaworthiness, but that Thyssenkrupp had not adequately demonstrated the viability of such a tort. (Doc. No. 19.) Thyssenkrupp objected to that ruling. (Doc. 21.) On January 22, 2014, Judge Ronnie Abrams affirmed the denial of discovery with leave for reconsideration in the event that Thyssenkrupp demonstrated the viability of its tort claim or any other basis of entitlement to the discovery. (Doc. 28.) Judge Abrams scheduled a conference for February 11, 2014 to discuss addressing the viability of the tort claim.[6] (*Id.*)

The parties appeared before me on February 11, 2014, made arguments about the viability of a maritime tort claim of financial unseaworthiness, and discussed the logistics related to briefing that issue. The parties agreed that WBC would file a motion for summary judgment as to the tort claim. On February 18, 2014, WBC filed a motion seeking summary judgment against the tort claim as well as against Thyssenkrupp's breach of contract claim of financial unseaworthiness under the charter party. (Doc. 37.) The next day, Thyssenkrupp wrote a letter asking to defer consideration of the motion because it addressed the contract claim and because discovery had not concluded. (Doc. 41.)

---

**3.** The case was initially assigned to Judge Ronnie Abrams.

**4.** Schedule A to the Complaint describes the cargo as steel plates with a value of $650,000, transported on the M/V Sanko pursuant to a bill of lading.

**5.** WBC is the only defendant to this action.

**6.** The case was reassigned to me on February 4, 2014.

That request was denied (Doc. 43), and Thyssenkrupp submitted its opposition to the motion. Thyssenkrupp's opposition papers included two purported expert reports. (*See* Docs. 45–2 & 45–3.) WBC requested that those reports be stricken as untimely because Thyssenkrupp failed to disclose its intention to file the reports and therefore WBC could not depose the experts. (Doc. 49.) That request was granted without prejudice to Thyssenkrupp seeking to admit the reports on a later date. (Doc. 55.)

WBC filed reply papers, and, by letter dated March 12, 2014, Thyssenkrupp seeks to strike part of the reply (*see* Doc. 60). Thyssenkrupp claims that the reply papers improperly include certain facts and arguments not raised in WBC's moving papers. (*Id.*) On April 1, 2014, WBC filed a letter citing additional case law concerning application of the Hague–Visby Rules to a charter party, noting that Thyssenkrupp had served four expert-witness disclosures, and requesting a conference to discuss a schedule for expert discovery. (Doc. 65.) In a response letter, Thyssenkrupp seeks to strike the additional case law cited by WBC, claims that its expert disclosures were made within the deadline for discovery, and states that no discovery conference should be held as the discovery deadline has passed. (Doc. 66.) By reply, WBC defends its citation to additional case law, and argues that Thyssenkrupp's interpretation of the discovery deadline would preclude Thyssenkrupp's own expert reports and that, regardless, WBC should be allowed time to submit its own expert reports and to depose Thyssenkrupp's experts. (Doc. 67.) In addition to the motion for summary judgment, these disputes are addressed below.

### III. *Standard of Review*

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan,* 287 F.3d 96, 103 (2d Cir. 2002); *see* Fed.R.Civ.P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, 106 S.Ct. 2505, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000).

To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R.Civ.P. 56(c)(1). In the event that "a party fails . . . to properly address another party's assertion of fact as required by

Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed.R.Civ.P. 56(e)(2), (3).

Finally, in considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir.1995) (internal citations and quotation marks omitted); *see also Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir.2002).

## IV. *Discussion*

WBC moves for summary judgment against claims of financial unseaworthiness brought in both tort and contract. Although directed to address only Plaintiff's tort claim, WBC has moved on both claims. I have considered WBC's motion as to each claim. WBC's motion related to the tort claim of financial unseaworthiness is granted, because this tort has not been recognized in this Circuit and because Plaintiff does not allege the type of damages required under this tort. Defendant's motion concerning the contract claim is denied as premature, as discovery had not been completed at the time of the filing of the motion.

**7.** Although the Fourth Circuit's decision in *Oriente Commercial, Inc. v. American Flag Vessel, M/V Floridian* addresses tort claims by

## A. *Tort Claim*

Although a handful of decisions have emerged from courts around the country recognizing, under certain circumstances, a maritime tort of financial unseaworthiness, none of those cases are binding authority in this Circuit. Neither the Second Circuit nor any District Court within this Circuit appears to have explicitly endorsed such a tort. I will not be the first. In any event, Thyssenkrupp fails to allege all the elements of the tort, and its claim would be barred by the economic loss doctrine established in *Robins Dry Dock*.

### 1. Recognition of the Tort of Financial Unseaworthiness

The tort of financial unseaworthiness was first recognized in *The Henry W. Breyer*, a decision from the District of Maryland. Although the Maryland District Court did not use the phrase "financial unseaworthiness," it held that where the owner of a ship was financially unable to "coal the ship or pay the crew ... the ship was guilty of a tort, and the shippers were entitled to recover the prepaid freight in an action of negligence." *See* 17 F.2d 423, 430–31 (D.Md.1927). Almost forty years later, that holding was extended by the court in *Morrisey v. S.S.A. & J. Faith*, which held that where delay is caused by the "reckless disregard of the owners for the financial security of the ship," and where foreseeable seizure of a vessel "causes damage to the cargo or the forced sale of the vessel results in the loss of prepaid freights," the carrier has breached its duty to the shipper. 252 F.Supp. 54, 58–59 (N.D.Ohio 1965). Another thirty years passed before the Fifth Circuit became the only United States Court of Appeals to explicitly endorse the tort.[7] In *Associated Metals & Minerals*

two shippers arising after a vessel was seized by creditors, it does not appear that either claim was for financial unseaworthiness. *See*

*Corp. v. Alexander's Unity MV,* the court upheld tort liability for financial unseaworthiness after concluding that the shipper's cargo "was damaged not only by the breach of contract of carriage by the vessel but also by the physical and financial unseaworthiness of the vessel and the negligence of the owners and/or operators." 41 F.3d 1007, 1017 (5th Cir.1995). The decisions in *The Henry W. Breyer, Morrisey,* and *Alexander's Unity* form the primary case law recognizing this tort. Five other district-court decisions, spanning nearly sixty years, round out the body of law suggesting the viability of this claim. *See In re Ocean Club Servs., LLC,* 355 B.R. 886 (Bankr.S.D.Fla.2006); *Gulf Marine & Indus. Supplies, Inc. v. M/V Golden Prince,* No. 99–CV–156, 1999 WL 670997 (E.D.La. Aug. 25, 1999); *Calogeras Marine Inc. v. M/V Ocean Leader,* No. 96–CV–3614, 1997 WL 737682 (E.D.La. Nov. 25, 1997); *Potash Co. of Canada v. M/V Raleigh,* 361 F.Supp. 120 (D.C.Z.1973); *Todd Shipyards Corp. v. City of Athens,*

83 F.Supp. 67 (D.Md.1949). These eight cases appear to be the only decisions that directly address financial unseaworthiness as a tort.[8] None of these cases, however, arose in this Circuit,[9] where the viability of the tort is at least an open question, if not one of first impression.[10]

The parties have, at various times, pointed to two decisions to suggest the recognition of the tort in this District: *Texport Oil v. M/V Amolyntos,* 11 F.3d 361 (2d Cir.1993), *overruled on other grounds, Wilton v. Seven Falls Co.,* 515 U.S. 277, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995); and *Cargill Inc. v. M/T Pacific Dawn,* 876 F.Supp. 508 (S.D.N.Y.1995). However, neither decision endorsed, or even directly discussed, a tort of financial unseaworthiness. The Court in *Texport Oil* recognized certain types of tort claims with respect to cargo and held that certain claims brought in contract under COGSA are mixed tort, contract and bailment causes of actions.[11] *See* 11 F.3d at 367;

---

8. In briefing the motion, Plaintiff cited *The Henry W. Breyer, Morrisey,* and *Alexander's Unity,* while Defendant cited *Morrisey, Alexander's Unity, Ocean Club,* and *Gulf Marine.*

529 F.2d 221, 221–22 (4th Cir.1975). One claim involved meat that was damaged in transit, but apparently not due to delay. *See id.* The other involved cargo that "the vessel negligently failed to deliver," *id.* at 222, which likewise does not appear attributable to the seizure or delay.

9. The Second Circuit has acknowledged without accepting the holding in *The Henry W. Breyer* that "where a ship, after receiving cargo on board, issuing bill of lading, and receiving prepayment of freight, fails to sail, the remedy of the shippers may at their option lie in tort for breach of a duty imposed upon carriers by common law." *See Silva v. Bankers Commercial Corp.,* 163 F.2d 602, 606 (2d Cir.1947). The Court in *Silva* held, among other things, that a claim for rescission of a pre-paid freight contract was not a maritime case and did not invest the admiralty court with jurisdiction. The Second Circuit has also cited *Morrisey,* for the proposition that

pursuant to the Carriage of Goods at Sea Act ("COGSA") a shipper has the burden of declaring the nature and value of goods and paying a higher tariff if he wishes to impose higher liability upon a carrier, *see Std. Electrica, S.A. v. Hamburg Sudamerikanische Dampfschiffahrts–Gesellschaft,* 375 F.2d 943, 945 (2d Cir.1967), and has cited *Alexander's Unity,* for the proposition that certain claims under COGSA are mixed tort, contract and bailment claims, *see Rationis Enterprises Inc. of Panama v. Hyundai Mipo Dockyard Co.,* 426 F.3d 580, 587 n. 3 (2d Cir.2005).

10. Indeed, the only decision within the Circuit using the phrase "financial unseaworthiness" appears to be Judge Abrams' decision upholding Judge Netburn's discovery ruling in this case. *See Thyssenkrupp Materials N.A., Inc. v. Western Bulk Carriers A/S,* No. 13–CV–1248, 2014 WL 335595 (S.D.N.Y. Jan. 22, 2014).

11. To the extent that Thyssenkrupp contends that, in recognizing certain other cargo claims as sounding in tort, *Texport Oil* thereby validates financial unseaworthiness as a

*see also Rationis*, 426 F.3d at 580 n. 3. It did not, nor was it asked to, recognize a tort of financial unseaworthiness. Instead, the issue in *Texport Oil* concerned whether the collateral-source rule applies to claims brought under COGSA. *See* 11 F.3d at 367. In *Cargill*, the vessel in question was not seized by creditors but instead broke down, *see* 876 F.Supp. at 509, and the case itself concerned the relative priority of a lien for tug services, or salvage, *see id.* at 510–12. These cases do not support the notion that either the Second Circuit or this District has recognized a tort of financial unseaworthiness.

The most analogous case from this District appears to be Judge Haight's decision in *Drew Ameroid International v. M/V Green Star*, 681 F.Supp. 1056 (S.D.N.Y. 1988). The intervenor in that case sought to disclaim any obligation to the owner of a seized vessel, where the intervenor prepaid freight upon loading of its cargo but the voyage had not even begun when the vessel was seized. *See id.* at 1057–58. The decision holds that "where a shipowner is so burdened by indebtedness to third parties that its vessels are subject to arrest at any time and in any port, the shipowner cannot receive or retain freight, even under an earned freight clause in the charter party or bill of lading, when an arrest occurs and prevents commencement or completion of the voyage and delivery of the cargo for whose transportation the freight is payable." [12] *Id.* at 1061. However, that holding was based on the language of the earned-freight clause in the charter party at issue, and not on tort principles. *See id.* at 1059. In addition, nothing in that decision suggests that its holding would extend from shipowners to carriers, or from loss of prepaid freight to damages occasioned by delay.[13]

■ A tort of financial unseaworthiness has not been recognized in this Circuit, and I decline to do so here. In any event, as explained below, the facts in this case do not support a tort claim of financial unseaworthiness under the authorities outlined above.

### 2. Damages

Even if the tort were recognized and applied in this Circuit, Thyssenkrupp fails to demonstrate a valid claim because it has not suffered the type of damages required to assert the tort. In order to state a claim of financial unseaworthiness, a party must allege the following: "(1) a duty to provide a seaworthy vessel, (2) foreseeable termination or interruption of the intended voyage due to the financial condition of the vessel's owners, (3) actual termination or interruption resulting from the financial condition, and (4) damages, commonly the loss of prepaid freight." *See Ocean Club*, 355 B.R. at 892 (outlining the elements for a financial unseaworthiness tort claim after surveying existing case law). Other decisions suggest that, in addition to loss of prepaid freight, the damages element can

---

12. tort claim, its argument proves too much. The recognition of some cargo claims as tort claims does not necessarily mean that all cargo claims are tort claims. Further, as explained in more detail, *infra* § IV(A)(2), Thyssenkrupp has not alleged appropriate damages to qualify its financial unseaworthiness claim as a tort, and the damages Thyssenkrupp does allege are barred in tort by the economic loss doctrine of *Robins Dry Dock*.

12. *Cf. Trans–Oceanic Peace Corp. v. India Supply Mission*, 325 F.Supp. 474, 478 (S.D.N.Y.1971) (plaintiff ship owner's claim for freight under theory of unjust enrichment denied where ship was seized by plaintiff's creditors, after which defendant's cargo was transported and discharged by a non-party).

13. It does not appear that any other courts in this Circuit have applied or cited the freight-related holding of *Drew Ameroid*.

be satisfied by physical damage to the cargo.[14] *See Gulf Marine,* 1999 WL 670997, at *7 (distinguishing *Alexander's Unity* on that ground and refusing to recognize tort); *Calogeras Marine,* 1997 WL 737682, at *1 (same). *See also* James M. Maloney, *A Breach in Tort's Clothing: Pleading Cargo Claims to Gain Lien Priority,* 27 J. Mar. L. & Com. 609, 633–34 (1996) (suggesting that plaintiff be required to show either physical damage to cargo or loss of prepaid freight to maintain tort claim).

The cases endorsing financial unseaworthiness as a tort all appear to involve damages in the form of loss of prepaid freight or physical damage to cargo. For example, in *Alexander's Unity,* plaintiff's cargo of steel was damaged by seawater after the carrying vessel was directed around the African continent instead of through the Suez Canal (the latter being a more expensive trip), and hatch covers were patched with tape instead of being repaired while the ship was at dock. *See* 41 F.3d at 1009. The court in *Morrisey* upheld liability against the vessel for financial unseaworthiness where the plaintiff lost prepaid freight, but noted that liability would also have been found if the cargo were damaged or injured. *See* 252 F.Supp. at 58–60. Similarly, the court in

*The Henry W. Breyer* described the shipper's claims as arising from the loss of cargo or from the loss of prepaid freight. *See* 17 F.2d at 428 (describing shippers' claims). *Potash Co.,* which expressly relied on *The Henry W. Breyer* as validating the tort claim absent physical damage, involved loss of prepaid freight. *See* 361 F.Supp. at 123. Other courts have held that a party has not stated a tort claim of financial unseaworthiness where it has not alleged or demonstrated a loss of prepaid freight or physical damage to cargo. *See, e.g., Gulf Marine,* 1999 WL 670997, at *7 (distinguishing *Alexander's Unity* and declining to recognize the tort because there was no damage to cargo); *Calogeras Marine,* 1997 WL 737682, at *1 (same).[15]

■ The restriction of damages to loss of prepaid freight or physical damage to cargo is consistent with the general rule against awarding purely economic damages in tort cases established by *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927) and its progeny. Specifically, the law of this Circuit is that "economic losses are not recoverable for an unintentional maritime tort in the absence of physical injury."[16] *Am. Petroleum & Transport, Inc. v. City of New York,* 737 F.3d 185, 195–96 (2d

**14.** Judge Netburn and Judge Abrams both questioned, in light of the briefing before them, whether such a tort claim could be maintained other than in *in rem* proceedings. *The Henry W. Breyer, Morrisey, Potash Co.,* and *Alexander's Unity*—the cases finding liability under the tort—were all *in rem* proceedings. However, no court has stated that a tort claim of financial unseaworthiness can only be brought in an *in rem* proceeding. Instead, it appears that the tort is primarily asserted in *in rem* proceedings because of the lien priority ranking established by the Ship Mortgage Act, 46 U.S.C. §§ 31301–43. A preferred ship mortgage has priority over almost all other claims on a vessel, one exception being preferred maritime liens, which include

liens arising from maritime torts. *See Alexander's Unity,* 41 F.3d at 1011–12. Accordingly, a shipper's incentive to assert a tort claim in an action seeking a lien against the ship is lacking in an action against the carrier.

**15.** Two other decisions recognized the potential viability of the tort but held that it was not available where the cargo never boarded the vessel. *See Ocean Club,* 355 B.R. at 892; *Todd Shipyards,* 83 F.Supp. at 76 (passengers).

**16.** Although discussed here as a limitation on damages, the *Robins Dry Dock* rule is an independent bar to Thyssenkrupp's tort claim as asserted.

Cir.2013); *accord G & G Steel, Inc. v. Sea Wolf Marine Transp., LLC,* 380 Fed.Appx. 103, 104 (2d Cir.2010) (summary order); *Agwilines, Inc. v. Eagle Oil & Shipping Co.,* 153 F.2d 869, 871 (2d Cir.1946). This rule has been "accepted by a clear consensus of courts throughout the country." *Am. Petroleum,* 737 F.3d at 196; *see id.* at 191–92 (noting approval of rule by Third, Fourth, Fifth, Ninth, and Eleventh Circuits).

Thyssenkrupp attempts to distinguish or limit the rule by arguing that the actual decision in *Robins Dry Dock* only bars claims to plaintiffs not in privity with the tortfeasors, in other words, indirect as opposed to direct claims. This argument ignores the cases in this Circuit discussing the rule after *Robins Dry Dock.* The Second Circuit in *American Petroleum* acknowledged that the rule it outlined in that decision cannot be found in the text of *Robins Dry Dock, see id.* at 189, but has instead been developed and adopted by courts in the years since, *see id.* at 190–96. The Second Circuit expressly endorsed the rule "that economic losses are not recoverable for an unintentional maritime tort in the absence of physical injury," *see id.* at 195–96, even while noting the "uneven course" of its treatment in this Circuit, *see id.* at 192. Finally, the Court held that the rule will stand in this Circuit "unless and until altered by Congress or the Supreme Court." *Id.* at 186. Neither the Supreme Court nor Congress has sought to alter or modify the rule. Therefore, the rule described in *American Petroleum* is applicable here, and means that a tort of financial unseaworthiness cannot be maintained for purely economic loss in the absence of physical damage.

Accordingly, to maintain a tort of financial unseaworthiness, Thyssenkrupp must demonstrate that it lost prepaid freight (which is not a purely economic injury) or that its cargo of steel suffered physical damage. Thyssenkrupp does not allege that it suffered either form of damage. Instead, Thyssenkrupp seeks to recover only the difference in market value at the time the steel was scheduled to be delivered and at the time it actually was delivered.[17] Thyssenkrupp does not dispute that such delay damages are purely economic in nature. Nor is the purported tort intentional; on the contrary, Thyssenkrupp contends that WBC was negligent in failing to conduct due diligence on the M/V Sanko and its owner. Thus, even if the Court recognized financial unseaworthiness as a tort, WBC would be entitled to summary judgment against that claim.

### B. *Contract Claim*

Although it was not called for at the February 11, 2014 conference, WBC also moves for summary judgment against Thyssenkrupp's claim that WBC breached the charter party by failing to exercise due diligence and/or by providing a financially unseaworthy vessel. Thyssenkrupp argues that WBC is liable for delay damages under certain provisions of the charter party, most prominently Clause 60 (WBC's guarantee that the chartered vessel is free from financial obligations that would interfere with its performance and that WBC would be responsible for damages caused by interruption of the vessel's performance). WBC argues that it has defenses to liability under the charter party, namely that it exercised due diligence (*see* Clause 2) and that the clause paramount (Clause 63) incorporates the Hague–Visby Rules,

---

17. Although Thyssenkrupp alleges that four plates of steel were never delivered, it has not raised that argument in opposing the instant motion, and has made no attempt to connect the alleged loss of those plates with the delay occasioned by the seizure of the M/V Sanko.

which bar losses from unexpected arrest or seizure under legal process, as WBC contends was the case here.

Thyssenkrupp is correct that summary judgment is premature at this stage with respect to the contract claim. *See* Fed. R.Civ.P. 56(d)(1); *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 301, 307 (2d Cir.2003). Discovery had not ended when this briefing began, and there are factual issues that might bear further development, among them whether the vessel itself was financially unseaworthy and the steps taken by WBC to ensure the financial security of the vessel and its owner. Indeed, the parties' competing Rule 56.1 Statements suggest that the question of diligence, in particular, may give rise to disputed issues of material fact. *See* Plf.'s 56.1, ¶¶ 11–13. Additionally, Thyssenkrupp indicated its intention to submit expert reports in connection with the contract claim, but could not timely do so with respect to this motion. Therefore, WBC's summary judgment motion is denied as to the contract claim without prejudice to renewing the motion at a later date.

Because the Court considers the motion for summary judgment premature as to the contract claim, Thyssenkrupp's request to strike WBC's reply papers—specifically, factual allegations contained in a reply Rule 56.1 Statement and two arguments relating to the terms of the charter party—is denied as moot. Thyssenkrupp's request that the Court not consider the two cases related to the contract claim cited in a letter from WBC after briefing had closed is also denied as moot.

### V. *Conclusion*

For the foregoing reasons, Defendant's motion for summary judgment is GRANT-ED with respect to Plaintiff's tort claim of financial unseaworthiness, and is DENIED with respect to Plaintiff's contract claim.

The referral to Judge Netburn for general pretrial purposes remains in force. The parties should address any remaining discovery issues to Judge Netburn.[18]

SO ORDERED.

---

**18.** I do note, however, that Thyssenkrupp's argument that by serving expert reports on the discovery deadline it effectively prevented WBC from deposing those experts and/or submitting reports in response is untenable. Either Thyssenkrupp's reports must be stricken, or WBC must be permitted to depose those experts and/or submit its own expert reports.